**Vito BALICE, individually and as the Agent of O.R.C. Company, Plaintiff–Appellant,**

v.

**U.S. DEPARTMENT OF AGRICULTURE, Defendant–Appellee.**

No. 98–16766.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 11, 2000.

Filed Feb. 8, 2000.

Brian C. Leighton, Clovis, California, for the plaintiff-appellant.

M. Bradley Flynn, United States Department of Agriculture, Washington, D.C., for the defendant-appellee.

Before: GRAAFEILAND,[1] ALARCON, and SILVERMAN, Circuit Judges.

ALARCON, Circuit Judge:

Vito Balice ("Balice") appeals from the district court's final order affirming the judicial officer's ("JO") decision to assess a $225,500 civil penalty against him pursuant to § 608c(14)(B) of the Agricultural Marketing Agreement Act of 1937 ("AMAA"). The JO assessed a civil penalty of $9,500 individually against Balice and a civil penalty of $216,000 jointly and severally against Balice and his two uncles, Onofrio Calabrese and Rocco Calabrese ("Calabreses"), for violating various provisions of the Almond Marketing Order during the 1987–1988 crop year. Balice contends that the JO's decision to assess the penalty was arbitrary and capricious and in violation of the Eighth Amendment's prohibition against excessive fines. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm, because we conclude that the JO's

---

1. Honorable Ellsworth A. Van Graafeiland, Senior United States Circuit Judge, for the Second Circuit, sitting by designation.

determinations were supported by substantial evidence, that the JO's choice of sanction was neither unwarranted in law nor without justification in fact, and that the amount of the fine was not constitutionally excessive.

I

During the 1987–1988 crop year, Balice and the Calabreses, doing business as the O.R.C. Company, operated as handlers of almonds grown in California. *See* 7 C.F.R. § 981.13 (1987). As handlers of California almonds, they were subject to regulation under both the AMAA and the Almond Marketing Order. *See* 7 U.S.C. § 608c(1), (2), (6); 7 C.F.R. §§ 981.1–981.474 (1987). For the 1987–1988 crop year, the Almond Marketing Order required every handler of almonds to

(1) keep certain records during the course of the almond season and for two years following the end of the season (the "record keeping requirement"),

(2) furnish in a timely manner certain reports to the Almond Board of California (the "Almond Board") (the "reporting requirement"),

(3) maintain a reserve, and thus withhold from handling, an amount of almonds equal to 18% of the "kernel weight" of all almonds received for the handler's account (the "reserve requirement"), and

(4) dispose of the "kernel weight" of inedible almonds either to the Almond Board or to secondary outlets by a certain date (the "inedible disposition requirement").

Section § 608c(14)(B) of the AMAA authorized the Secretary of the USDA ("Secretary") to assess a civil penalty against a handler in an amount up to $1,000 for each violation of the Almond Marketing Order and directed the Secretary to treat each day in which the handler was in violation of the order as a separate violation. *Id.*

On January 5, 1990, the Administrator of the Agricultural Marketing Service, a branch of the U.S. Department of Agriculture ("USDA"), initiated a disciplinary proceeding against Balice and the Calabreses alleging that they had violated the record keeping, the reporting, the reserve, and the inedible disposition requirements of the Almond Marketing Order during the 1987–1988 crop year. Balice and the Calabreses filed answers denying those allegations. A two day administrative hearing was held before an administrative law judge ("ALJ") in March of 1991. Balice was represented by counsel and testified at the hearing. The Calabreses, who are citizens of Italy, were represented by separate counsel, but did not appear at the hearing.

The ALJ found that Balice and the Calabreses violated the record keeping, the reporting, the reserve, and the inedible disposition requirements of the Almond Marketing Order during the 1987–1988 crop year. The ALJ then assessed a civil penalty jointly and severally against the three in the amount of $216,000. That penalty consisted of fines in the amount of

(1) $74,500 for continuous violations of the record keeping requirement,

(2) $1,000 for the failure to file one report and for the late filing of another report,

(3) $62,000 for continuous violations of the reserve requirement, and

(4) $78,500 for continuous violations of the inedible disposition requirement.

Balice appealed the decision to the JO. The USDA filed a cross-appeal contending that the fine should be increased to $582,000. The Calabreses did not file an appeal from the decision.

The JO adopted most of the ALJ's findings, added several new findings, and increased the civil penalty from $216,000 to $225,500. That penalty consisted of fines in the amount of

(1) $74,500 for the continuous violations of the record keeping requirement,

(2) $2,000 for the failure to file one report and for the late filing of another report,

(3) $124,000 for the continuous violations of the reserve requirement, and

(4) $25,000 for the continuous violations of the inedible disposition requirement.

The JO determined that Balice was individually liable for $9,500 of the $225,500 penalty and that Balice and the Calabreses were jointly and severally liable for the remaining $216,000 of the penalty.

Balice filed a complaint in the district court seeking a review of the JO's decision and a declaration that the civil penalty was invalid. The district court concluded that there was substantial evidence to indicate that Balice had violated the record keeping, the reporting, the reserve, and the inedible disposition requirements of the Almond Marketing Order during the 1987–1988 crop year. It also found that the $225,500 penalty was neither arbitrary and capricious nor constitutionally excessive under the Eighth Amendment. Accordingly, the district court granted summary judgment in favor of the USDA. We review that decision de novo. *See Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).

## II

In this appeal, Balice contends that the JO erred in applying the penalty provisions of the AMAA. He argues that the JO should have considered "significant mitigating factors," such as his ability to pay the amount of the fine and his level of culpability, when assessing the penalty against him. He further argues that the JO's choice of sanction was arbitrary and capricious and that the JO's findings that he violated the record keeping and the inedible disposition requirements were not supported by substantial evidence.

■ Judicial review of an agency decision is narrow. We will not substitute our judgment for that of the agency. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Aluminum Co. of Amer. v. Administrator, Bonneville Power Admin.,* 175 F.3d 1156, 1160 (9th Cir. 1999). Under the Administrative Procedures Act, we may only set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We apply the substantial evidence standard when reviewing the factual findings of an agency. *See Armstrong v. Commissioner of the Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir.1998). When reviewing a choice of sanction, we are limited to determining "whether, under the pertinent statute and relevant facts, the Secretary made an allowable judgment in choice of remedy." *See Farley & Calfee, Inc. v. U.S. Dep't of Agric.,* 941 F.2d 964, 967 (9th Cir.1991) (internal quotations omitted). We will not overturn a penalty unless it is either "unwarranted in law or unjustified in fact." *Bosma v. U.S. Dep't of Agric.,* 754 F.2d 804, 810 (9th Cir.1984) (citing *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185–88, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973)).

### A

■ Balice contends that the JO erred in failing to consider "significant mitigating factors," such as his degree of culpability and his ability to pay a fine, when assessing the $225,500 civil penalty against him pursuant to § 608c(14)(B). The record shows, however, that the JO considered

the nature of the violations, the number of the violations, the damage or potential damage to the regulatory program from the type of violations involved here, the amount of profit potentially available to a handler who commits such violations, prior warnings or instructions given to Respondent Balice, and any other circumstances shedding light on the degree of culpability involved

when assessing the penalty against Balice. *In re Calabrese,* 51 Agric. Dec. 131, 154–55 (1992). We need only decide whether, as Balice suggests, the JO was required to consider Balice's ability to pay the amount of fine imposed. It is clear from the express language of the AMAA and from the legislative history of § 608c(14)(B) that Congress did not intend to limit the USDA's discretion in that manner.

In 1987, Congress amended § 608c(14)(B) out of concern for the integrity of the market order program. *See* 1987 U.S.Code Cong. & Admin. News, 2313–1, 2313–29. Prior to the amendment, only the U.S. Attorney's Office was authorized to initiate disciplinary proceedings to enforce the terms and conditions of market orders. *See id.* Due to the large volume of cases before that office, however, and because AMAA disciplinary proceedings are both time consuming and cumbersome, few U.S. Attorneys took the time to prosecute violations of market orders. *See id.*

As a result, Congress amended the statute's penalty provisions to allow the Secretary to enforce the requirements of market orders through the use of civil penalties. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 1501. The amendment authorized the Secretary to initiate administrative actions and to assess a penalty of not more than $1,000 for each violation of a market order. The amendment also required the Secretary to treat each day in which a handler is in violation of a market order as a separate

violation. *See id.;* 7 U.S.C. § 608c(14)(B); *see also* 1987 U.S.Code Cong. & Admin. News, 2313–1, 2313–29, 2313–30. The amendment did not, however, set forth a list of specific factors for the Secretary to consider when exercising that grant of authority. "It simply ... authorize[d] the Secretary ... to seek an administrative civil penalty when circumstances indicate that it would be an effective regulatory enforcement tool." 1987 U.S.Code Cong. & Admin. News, 2313–1, 2313–30.

We. decline to accept Balice's suggestion that we read into § 608c(14)(B) a means test that Congress failed to set forth in the statute. Indeed, when Congress has intended to create such a requirement in the past, it has expressly identified and carefully described that factor in the penalty provision itself. When Congress amended the penalty provision of the Packers and Stockyards Act in 1976, for instance, it · specifically directed the USDA to consider the effect of a sanction on a person's ability to continue in business before assessing a civil penalty for any unfair, discriminatory, or deceptive business practice.[2] *See* Act of Sept. 13, 1976, Pub.L. No. 94–410 § 3(b) (codified at 7 U.S.C. § 213(b)); *see also Bosma,* 754 F.2d at 810 (holding that the USDA bears the burden of producing evidence to show that a civil penalty is reasonable under the factors specified in 7 U.S.C. § 213(b)). Congress has also included similar provisions in the Clean Air Act and in the Shipping Act.[3] *See* 42 U.S.C. § 7413(e)(1);

---

**2.** Section 213 of the Packers and Stockyard Act provides, in pertinent part:

> (b) Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner, market agency, or dealer is violating the provisions of subsection (a) of this section, the Secretary after notice and full hearing may make an order that he shall cease and desist from continuing such violation to the extent that the Secretary finds that it does or will exist. The Secretary may also assess a civil penalty of not more than $10,000 for each such violation. *In determining the amount of the civil penal-*

*ty to be assessed under this section, the Secretary shall consider the gravity of the offense, the size of the business involved, and the effect of the penalty on the person's ability to continue in business ....* 7 U.S.C. § 213(b) (emphasis added).

**3.** Section 7413 of the Clean Air Act, provides, in pertinent part

> (e) Penalty assessment criteria
> · (1) *In determining the amount of any penalty to be assessed* under this section or section 7604(a) of this title, *the Administrator or the court,* as appropriate, *shall take into consideration (in addi-*

46 App. U.S.C. § 1712(c). We believe that, had Congress intended to require the Secretary to consider a handler's ability to pay when assessing a penalty for a violation of a market order, it surely would have so provided in the plain language of the AMAA or at least noted the fact during its legislative sessions.[4] *See Farley & Calfee, Inc.*, 941 F.2d at 969–70 (declining an appellant's "plea for mitigation and leniency" where the Perishable Agricultural Commodities Act and the USDA "appear to provide little of either").

Our holding that the AMAA does not require the USDA to consider an almond handler's ability to pay a civil penalty is not at odds with the Eighth Circuit's decision in *Corder v. United States*, 107 F.3d 595, 598 (8th Cir.1997).[5] In that case, the court invalidated a regulation that applied a series of multipliers in a manner that subjected nearly every first time offender of the Food Stamp Act ("FSA") to a $40,000 fine. *See id.* at 598. The court did not construe the omission of mitigating factors in the penalty provisions of the FSA to be "a grant of standardless discretion to impose whatever fine the agency pleases." *Id.* at 597. Instead, it interpreted the omission of the mitigating factors as a "signal that [the agency] should follow principles of fairness that Congress has more clearly delineated in other laws administered" by the USDA, including the Packers and Stockyards Act. *Id.* at 598.

---

4. Where a statute requires an agency to consider specific mitigating factors before assessing a civil penalty, § 556(d) of the Administrative Procedures Act places on the agency the burden of producing evidence showing that a proposed penalty is reasonable in light of those factors. *See* 5 U.S.C. § 556(d) (providing that the "proponent of a rule or order has the burden of proof"); *Bosma*, 754 F.2d at 810 (vacating a penalty imposed pursuant to § 213(b) of the Packers and Stockyards Act where neither the USDA nor the market agent furnished evidence concerning the size of the agent's business or the effect of the penalty on the agent's ability to continue on in business). As discussed in the text, however, we hold that § 608c(14)(B) of the AMAA did not impose a duty on the USDA to come forward with evidence showing that Balice had the means to pay the $225,500 civil penalty. Nor did Balice ever attempt to present evidence in the administrative proceeding concerning his inability to pay any amount of penalty.

> tion to such other factors as Justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation. 42 U.S.C. § 7413(e)(1) (emphasis added).

Section 1712 of the Shipping Act provides, in pertinent part:

(c) Assessment procedures

Until a matter is referred to the Attorney General, the Commission may, after notice and an opportunity for hearing, assess each civil penalty provided for in this chapter. *In determining the amount of the penalty, the Commission shall take into account the* nature, circumstances, extent, and gravity of the violation committed and, with respect to the violator, the degree of culpability, history of prior offenses, *ability to pay,* and such other matters as justice may require. The Commission may compromise, modify, or remit, with or without conditions, any civil penalty. 46 App. U.S.C. § 1712(c) (emphasis added).

5. Our holding is limited to adjudications occurring prior to the effective date of § 223(a) of the Small Business Regulatory Enforcement Fairness Act of 1996. Pub.L. No. 104–121 § 223(a) (set out as a note under 5 U.S.C. § 601). That section, which was not in effect when this action was adjudicated, provides:

> (a) In general.Each agency regulating the activities of small entities shall establish a policy or program within 1 year of enactment of this section [Mar. 29, 1996] to provide for the reduction, and under appropriate circumstances for the waiver, of civil penalties for violation of a statutory or regulatory requirement by a small entity. Under appropriate circumstances, an agency may consider ability to pay in determining penalty assessments on small entities. *Id.*

Whether § 223(a) requires the USDA to consider a handler's ability to pay a civil penalty assessed under § 608c(14)(B) is a question for the future.

We do not read *Corder* as always requiring the USDA to consider the mitigating factors specified in the penalty provisions of the Packers and Stockyards Act or in similar legislation. In *Corder*, the Eighth Circuit simply invalidated a regulation that reflected the USDA's "hostile attitude toward an alternative monetary sanction Congress enacted" to alleviate the "excessively harsh" penalty that the FSA had previously mandated. *Id.* at 597–98; *see also* H.R.Rep. No. 100–828, pt. 1, 27–28 (1988). The legislative history of the penalty provision at issue in that case indicates that Congress specifically intended the USDA to consider certain mitigating factors when assessing a fine under the FSA. In providing for the alternative monetary sanction, Congress noted that "permanent disqualification ... upon the first trafficking offense-*without any evaluation of preventive measures taken or complicity in the trafficking-seems excessively harsh.*" H. Rep. No. 100–828, pt. 1, 27–28 (1988) (emphasis added). It then stated that the purpose of the monetary sanction was to ensure "that the punishment will more closely fit the crime." *Id.* That purpose is quite distinct from the purpose of the amendment to § 608c(14)(B) of the AMAA, which was to ensure that "regulatory violations of market orders will be dealt with in a timely, efficient, and effective manner." 1987 U.S.Code Cong. & Admin. News, 2313–1, 2313–30.

Nor do we find the reasoning in *Corder* persuasive under the facts of this case. Unlike the penalty in *Corder*, the sanction imposed in this case was not the product of a "standardless exercise of discretion." Rather, it was the result of an informed administrative decision making process that took into account the nature of the violations, the number of the violations, the damage or potential damage to the market order program, the amount of profit potentially available to Balice, the extent to which Balice had received prior warnings or instructions, and any other circumstances shedding light on the degree of Balice's culpability. The JO's failure to consider Balice's ability to pay was not erroneous.

## B

The JO found that Balice violated the record keeping requirements of § 981.70 of the Almond Marketing Order by failing to maintain necessary records on May 18, 1988 and from March 13, 1989 until the USDA filed its complaint on January 5, 1990. For those violations, the JO assessed a penalty against Balice of $250 per day for the 298 days in which Balice had failed to maintain the necessary records. Balice contends that "it is arbitrary and capricious ... to fine Balice on a daily basis for not providing records that he did not have, and that the USDA was no longer demanding." He also argues that the amount of his penalty should not have been calculated based on the filing of the complaint, an event over which he had no control.

Section 981.70 of the Almond Marketing Order requires an almond handler to maintain records which "clearly show the details of his receipts of almonds, withholdings, sales, shipments, inventories, reserve disposition, advertising and promotion activities, and other pertinent information in respect to his operations."[6] 7 C.F.R.

---

6. The Almond Marketing Order provides, in pertinent part:

 § 981.70 Records and verification.
 Each handler shall keep records which will clearly show the details of his receipts of almonds, withholdings, sales, shipments, inventories, reserve disposition, advertising and promotion activities, and other pertinent information in respect to his operations pursuant to the provisions of this part.

Such records shall be retained by the handler for 2 years after the end of the crop year to which they apply. Each handler's premises shall be accessible to authorized representatives of the Board and the Secretary for examination and audit of the aforesaid records and for inspection and observation of almonds. The Board shall make such checks of almonds or audits of each handler's records as it deems appropriate

§ 981.70 (1987). That section further provides that handlers must retain those records for "2 years after the end of the crop year to which they apply" and that "each handler's premises shall be accessible to authorized representatives of the Board and the Secretary for examination and audit." *Id.*

■ There is substantial evidence in the administrative record to support the JO's conclusion that Balice violated § 981.70 for 298 days. At the administrative hearing, the USDA introduced Balice's statements to an auditor that he had failed to inspect incoming almonds, that he had purchased some almonds on a cash basis without obtaining receipts, and that he had retained only shipping invoices and bills of lading for other purchases. Balice was also under a continuing duty to provide that information to the USDA during the times in question. A compliance officer testified that he made an "open ended" request for Balice's records for the 1987–1988 crop year on March 13, 1988 and that Balice had never supplied them. *See Big Bear Super Market No. 3 v. Immigration & Naturalization Serv.*, 913 F.2d 754, 757 (9th Cir.1990) (holding that the Immigration Reform and Control Act, which requires employers to maintain Forms I–9 and make them available for inspection for 3 years, imposes on employers a continuing duty to present the forms upon request). The JO's decision that Balice had "failed in his duty to maintain adequate records" during the times in question was therefore proper.

■ The JO's decision to fine Balice $250 for each day in which he failed to produce the requested information was neither arbitrary nor capricious. The rec-

ord keeping requirement is essential to the enforcement and operation of the market order program. It serves the purpose not only of verifying a handler's compliance with the provisions of the Almond Market Order, but also of enabling the Almond Board to set its economic policy. Indeed, Congress has authorized the USDA to fine a handler up to $1,000 per day for each day in which the handler fails to maintain the necessary records. *See* 7 U.S.C. § 608c(14)(B). Under that authority, the JO could have assessed against Balice a fine for as much as $298,000. The JO's decision to impose a fine of one fourth of that amount, while severe, was allowable.

■ We agree with the JO that it is irrelevant that records were in Italy. The Almond Marketing Order specifically required Balice to make his premises available for an audit and to maintain the necessary records during the entire 1987–1988 crop year and for two years thereafter. *See* 7 C.F.R. § 981.70 (1987). Balice was aware that the USDA had made an ongoing request for records when he forwarded the documents to Italy. He was then in control of the records and reasonably could have delivered them to the USDA or, at the very least, made copies available for inspection. Balice's contention that it was arbitrary and capricious for the JO to calculate the penalty based on the filing of the complaint is devoid of merit.

### C

■ The JO additionally found that Balice violated the reporting requirements of § 981.74 and § 981.472 of the Almond Marketing Order by failing to file one report and by filing another report late. *See* 7 C.F.R. §§ 981.74, 981.472 (1987).[7]

---

or are requested by the Secretary to insure that accurate information as required in this part is being furnished by handlers. 7 C.F.R. § 981.70 (1987).

7. The Almond Marketing Order provides, in pertinent part:

§ 981.472 Report of almonds received.

(a) Each handler shall report to the Board on ABC Form 1 the total adjusted kernel weight of almonds, by varieties, received by it for its own account within any of the hereinafter prescribed reporting periods. Each such report shall be filed with the Board within five (5) business days after the close of the applica-

The JO declined to accept, however, the ALJ's decision to impose a total fine of $1,000 for those violations. The JO concluded that the offenses were "serious" and imposed a $2,000 fine instead. That penalty was the largest sanction authorized by the AMAA. *See* 7 U.S.C. § 608c(14)(B). Balice does not dispute that he violated the reporting requirements. Rather, he suggests that the JO's decision to increase the fine without first requiring the USDA to show harm to the government was arbitrary and capricious.

We are not persuaded that the USDA was required to show harm to the government before the JO could increase the fine from $1,000 to $2,000. Section 557(b) of the Administrative Procedures Act provides that on an appeal from, or a review of, the initial decision of an ALJ, an "agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b). We have interpreted

that section as allowing a JO to increase a penalty that is proposed by an ALJ. *See Holiday Food Serv., Inc. v. Department of Agric.*, 820 F.2d 1103, 1105 (9th Cir.1987) (citing *Stamper v. Secretary of Agric.*, 722 F.2d 1483, 1489 (9th Cir.1984)). We have not, however, construed that language as requiring an agency to show harm to the government before a JO may perform such an increase. *See id.* For, to do so would contravene the express terms of § 557(b). We therefore decline to accept Balice's suggestion that the USDA was required to show harm to the government before the JO could increase the penalty for the reporting violations.

### D

█ The JO also found that Balice violated the minimum reserve requirement of §§ 981.46, 981.50, and 981.52 of the Almond Marketing Order by failing to maintain in his possession, or under his control, a minimum quantity of almonds.[8] *Id.* For

ble one of the following reporting periods: July 1 to August 31; September 1 to September 15; September 16 to September 30; October 1 to October 15; October 16 to October 31; November 1 to November 15 to November 16 to November 30; December 1 to December 31; January 1 to March 31; April 1 to June 30.
(b) For the reporting periods July 1 through December 31, and January 1 through March 31, each handler shall submit a summary report to the Board, within 30 days after the end of the reporting period, which shall show the adjusted kernel weight of almonds received for the handler's own account by county of production and such varieties as may be requested by the Board. 7 C.F.R. § 981.472 (1987).
§ 981.74 Other reports.
Upon the request of the Board, made with the approval of the Secretary, every handler shall furnish to the Board in such manner and at such times as it prescribes (in addition to such other reports as are specifically provided for in this part) such other information as will enable the Board to perform its duties and exercise its powers hereunder. 7 C.F.R. § 981.74 (1987).

8. The Almond Marketing Order provides, in pertinent part:

§ 981.46 Withholding reserve.
When a reserve percentage has been fixed for any crop year, as hereinafter provided, no handler shall handle almonds except on condition that he comply with the requirements in respect to withholding reserve almonds and the prescribed disposition thereof. 7 C.F.R. § 981.46 (1987).
§ 981.50 Reserve Obligation.
Whenever salable and reserve percentages are in effect for a crop year, each handler shall withhold from handling a quantity of almonds having a kernel weight equal to the reserve percentage of the kernel weight of all almonds such handler receives for his own account during the crop year: Provided, that, any quantity of almonds delivered to outlets such as poultry or animal feed or crushing into oil, in a manner permitting accountability to the Board, shall not be included in such receipts. The quantity of almonds hereby required to be withheld from handling shall constitute, and may be referred to as the "reserve" or "reserve obligation" of a handler. The almonds handled as salable almonds by any handler, in accordance with the provisions of this part, shall be deemed to be that handler's quota fixed by the Secretary within the meaning of section 8a(5) of the act. 7 C.F.R. § 981.50 (1987).

the 1987–1988 crop year, the Secretary estimated that the domestic and worldwide almond crop was expected to be the largest in history and, as a result, established an 18% reserve requirement. *See id.* That requirement imposed a strict duty on handlers to withhold from handling 18% of the kernel weight of all almonds they received for their own account during the season. *See* 7 C.F.R. § 981.23 (1987); 52 Fed.Reg. 39,900, 39,901–3 (1987). The Secretary also warned that reserve almonds would be diverted to low paying secondary outlets unless market demand outpaced the supply of nonreserve almonds.[9] *See* 52 Fed.Reg. at 39,901.

The JO found that Balice failed to maintain adequate reserves on March 22, 1988 and from March 31, 1988 through July 31, 1988 when the Secretary terminated the reserve requirement. The JO found that Balice's conduct was a "very serious violation of the AMAA and the Order" and, as a result assessed a total penalty of $124,000 against Balice for the 124 days that Balice was in violation of the reserve requirement. Balice concedes that he was in violation of the reserve requirement on the days in question. He contends, however, that the JO's decision to impose such a large fine was arbitrary and capricious. He argues that the $124,000 penalty, which is the statutory maximum, is impermissibly high given that other almond sellers made an "equal profit" when the Secretary released the almond reserve on July 31, 1988, that he was a small-time handler of almonds, and that the penalty could not have been higher if he had sold his entire reserve into the open market.[10]

We reject Balice's contention that the JO's choice of sanction was unwarranted.

The fact that the Secretary ultimately released the reserve and the fact that Balice was a small-time handler of almonds do not mitigate the fact that Balice violated the order by selling surplus almonds into a market that the Secretary had deemed closed. The purpose of the reserve requirement is to prevent handlers from destabilizing the price of almonds by selling excess almonds into a highly saturated market. *See* 52 Fed.Reg. 39,900, 39,900–3 (1987). Because the Almond Market Order provided that the Secretary could allocate reserve almonds to purchasers in low paying secondary outlets, even a small time handler could make large profits by selling reserve almonds at nonreserve prices. *See* 52 Fed.Reg. 39,000, 39,901.

In fact, we agree that Balice made a potential profit of roughly $250,000 simply by selling one third of his reserve into the open market. For the 1987–1988 crop year, the Almond Marketing Order strictly required handlers to withhold from the open market 18% of the quantity of almonds handled for their own accounts. *See* 52 Fed.Reg. 39,900, 39,900–3 (1987). By selling his reserve, Balice took advantage of an artificially high demand and unlawfully disposed of almonds at a price of $1.40 a pound when those almonds were lawfully salable at a price of only $0.05–$0.08 per pound. We are not persuaded by the fact that the Secretary later released the reserve and allowed handlers to sell their reserve almonds at normal market prices. Profit is determined based on the prevailing market prices at the time of a sale. Were the rule otherwise, almond handlers could engage in strategic behavior and disturb the sensitive supply-and-

9. The Secretary explained the possible disposition of reserve almonds for the 1987–1988 crop year:

Reserve almonds could be transferred to the salable category at a later date if it is found that the salable percentage is insufficient to satisfy 1987–88 trade demand, including desirable carryover requirements for use during the 1988–89 crop year (if it appears that the 1988 crop will be insuffi-

cient to meet 1988–89 trade demand needs). *Otherwise, reserve almonds will be diverted to secondary outlets* such as almond oil or animal feed. 52 Fed.Reg. 39,900, 39,901 (1987) (emphasis added).

10. We note that Balice has abandoned his argument that he did not place the reserve almonds for sale in the "open market."

demand conditions of the almond market, but avoid liability simply because the price of almonds increased.[11]

Balice's contention that his penalty could not have been greater had he sold his entire reserve into the open market is equally unavailing. Though the JO's decision to impose the statutory maximum for only a partial sale of an almond reserve may create an incentive for those in violation of the reserve requirement to dispose of their entire reserve, that is not a factor that we will consider. The wisdom of the JO's policy decisions is beyond the scope of our review. It is a fundamental principle of law that "where Congress has entrusted an administrative agency with the responsibility of selecting the most effective means of achieving the statutory policy, the relation of remedy to policy is peculiarly a matter for administrative competence." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–186, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (citations and internal quotations omitted). In this case, Congress has entrusted the Secretary with the duty of operating the market order program and enforcing the terms and conditions of each order. It has also authorized the department to assess a penalty of $1,000 per day for each day that Balice had failed to maintain his reserve. *See* 7 U.S.C. § 608c(14)(B). The fact that it may

have been unwise for the JO to impose that fine is simply not relevant to the issue of whether the JO's choice of sanction was allowable.

### E

The JO also found that Balice violated the Almond Marketing Order by failing to dispose of 2,596 pounds of "inedible" almond kernels. An inedible almond kernel is a piece of an almond "with any defect scored as serious damage, or damage due to mold, gum, shrivel, or brown spot, ... or which has embedded dirt or other foreign material not easily removed by washing." 7 C.F.R. § 981.408 (1987). Section 981.42 of the Almond Marketing Order requires each handler to inspect all incoming almonds and to determine the percentage of all inedible almond kernels. *Id.* The order further requires each handler to accumulate the quantity of inedible kernels in excess of a threshold amount and to dispose of an equivalent "weight" of almond kernels to the Almond Board or to secondary outlets, such as "crushers, feed manufacturers, and feeders," by a certain date.[12] *Id.;* 7 C.F.R. § 981.442 (1987). Effective December 1, 1987, the Secretary set the threshold amount at 0% of a handler's total incoming kernel weight and set August 31, 1998, as the deadline for dis-

11. Even on a small scale, such strategic behavior may seriously affect the stability of the almond market. *See United States v. Ruzicka* 329 U.S. 287, 293, 67 S.Ct. 207, 91 L.Ed. 290 (1946) (stating that "even temporary defaults by some [milk] handlers may work unfairness to others, encourage wider non-compliance, and engender those subtle forces of doubt and distrust which so readily dislocate delicate economic arrangements").

12. The Almond Marketing Order provides, in pertinent part:

§ 981.442 Quality control.
(a) Incoming. Pursuant to § 981.42(a), the quantity of inedible kernels in each variety of almonds received by a handler, including almonds of his own production, shall be determined and disposed of in accordance with the provisions of this paragraph.

(a)(4) Disposition obligation. The weight of inedible kernels in excess of [a threshold] percent of kernel weight reported to the Board of any variety received by a handler shall constitute that handler's disposition obligation. If a variety other than Peerless is used as bleaching stock, the weight so used may be reported to the Board and the disposition obligation for that variety reduced proportionately.
(a)(5) Meeting the disposition obligation.... Each handler's disposition obligation shall be satisfied when the almond meat content of the material delivered to accepted users equals the disposition obligation, but no later than [a certain date], succeeding the crop year in which the obligation was incurred. 7 C.F.R. § 981.442 (1987).

posal. *See* 52 Fed.Reg. 29,222, 29,223 (1987). Each handler was therefore required to dispose of an amount of almonds equal to the full "weight" of the handler's inedible almond kernels by August 31, 1988. *See id.;* 7 C.F.R. § 981.442(a)(5) (1987).

The JO adopted the ALJ's findings that Balice handled a total of 571,726 pounds of almond kernels during the relevant part of the 1987–1988 almond season. Because Balice had failed to inspect his incoming almonds, the JO calculated Balice's inedible disposition obligation by applying the industry average for inedible kernels to Balice's total amount of incoming kernels. The JO calculated that obligation to be 10,291 pounds of kernels.[13] The JO also found that Balice had properly disposed of only 7,695 pounds of almond kernels before August 31, 1988, representing an inedible disposition shortfall of 2,596 pounds of kernels. For that shortfall, the JO assessed a penalty against Balice of $1,000 per day for the first 25 days that Balice was in violation of the requirement.

Balice claims that the JO abused its discretion in concluding that he violated the inedible disposition requirement. Balice agrees that he had an inedible disposition requirement of 10,291 pounds of almond kernels and that he disposed of only 7,695 pounds of inedible kernels, or 9,260 pounds of almond material, during the 1987–1988 crop year. He nevertheless suggests that he satisfied his inedible disposition obligation based on the following testimony by a member of the Almond Board:

Q So, are you saying that O.R.C. did not receive credit towards their 1987–88 inedible disposition through this inedible disposition on or about August 24th, 1988?

A They didn't meet the Marketing Order deadline by disposing of their inedibles by July 31st. Its likely, although I'm not sure, but its likely that we credited it on the books just to keep the books straight, but they didn't dispose of it by the deadline.

Q Were you aware of the fact on August 3, 1988, the Secretary issued the final rule in the Federal Register … extending the deadline for disposing of the '87–88 crop year inedible disposition to August 31st?

A I don't recall. I know that I mean, I'm not sure I was aware of it at the time. I don't recall now.

Q If the Secretary had indeed extended the deadline as indicated by the final rule to August 31, 1988, then did O.R.C. properly and within the time frame dispose of its inedibles for the '87–88 crop year?

A Yes.

Balice's reliance on the above testimony is misplaced. When read in context, the statement that Balice "properly and within the time frame disposed of its inedibles" merely indicates that Balice's August 24th disposition to Nut Oil, Inc. was timely. It does not indicate that the "weight" of that disposition was sufficient to satisfy Balice's obligation to dispose of 10,291 pounds of inedible kernels. Indeed, the August 24th disposition to Nut Oil, Inc. was the only inedible disposition that Balice made during the relevant part of the crop year. That disposition consisted of 9,323 pounds of almond material and had a "kernel weight" of only 7,695 pounds. While "within the time frame" and "proper," that disposition was insufficient to satisfy Balice's obligation to dispose of 10,291 pounds of inedible kernels. The JO therefore did not err in concluding that Balice had violated the inedible disposition requirement.

 Balice also contends that the JO acted arbitrarily and capriciously by fining him $1,000 per day for the first 25 days in which he violated the inedible disposition

---

13. Both parties agree that Balice had an inedible disposition requirement of 10,291 pounds of kernels. That figure represents 1.8% of the 571,726 pounds of almond kernels that Balice took in during the relevant part of the 1987–1988 season.

requirement. He suggests that this court should invalidate the penalty, because the inedible disposition requirement is a "joke." He reasons that the inedible disposition requirement "is in reality volume control and not quality control, because there are no regulations regarding the percentage of inedible almonds that can be shipped to consumers."

The fact that Balice believes that the inedible disposition requirement is a "joke" is not a proper basis for contesting the JO's decision to impose a fine pursuant to § 608c(14)(B) of the AMAA. Section 608c(14)(B) authorizes the Secretary to fine an almond handler $1,000 per day for each day in which the handler is in violation of a marketing order. *See* 7 U.S.C. § 608c(14)(B). As an exception, that section also allows a handler to avoid liability for violating a provision of a market order only if the handler contemporaneously files a written petition with the Secretary that prays for a modification of the order or for an exemption from its requirements.[14] *Id.; see also* 7 U.S.C. § 608c(15)(B). In this case, Balice did not file a written petition with the Secretary pursuant to § 608c(15) between September 1, 1988 and September 25, 1988 and, as a result, cannot qualify for the exception to liability under

§ 608c(14)(B). Thus, the JO's decision to assess the statutorily authorized penalty of $25,000 was allowable.

## III

 Finally, Balice contends that the $225,500 penalty violates the Eighth Amendment to the United States Constitution. That Amendment provides that "Excessive Bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const., Amdt. 8. The Supreme Court has recognized that a civil penalty satisfies those protections so long as it is not grossly disproportionate to the gravity of the offense for which it is imposed. *See United States v. Bajakajian,* 524 U.S. 321, 334–35, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Whether a penalty is grossly disproportionate calls for the application of a constitutional standard to the facts of a particular case, and in that context, de novo review is appropriate. *See id.* at 337 n. 10, 118 S.Ct. 2028.

Neither party disputes that the imposition of the $225,500 fine implicates the Eighth Amendment. We need only decide whether the penalty is grossly dispropor-

---

**14.** Section 608c of the AMAA provides, in pertinent part:

(14) Violation of order; penalty.

(B) Any handler subject to an order issued under this section, or any officer, director, agent, or employee of such handler, who violates any provision of such order may be assessed a civil penalty by the Secretary not exceeding $ 1,000 for each such violation. Each day during which such violation continues shall be deemed a separate violation, *except* that *if the Secretary finds that a petition pursuant to paragraph (15) was filed and prosecuted by the handler in good faith and not for delay, no civil penalty may be assessed under this paragraph for such violations as occurred between the date on which the handler's petition was filed with the Secretary, and the date on which notice of the Secretary's ruling thereon was given to the handler in accordance with regulations prescribed pursuant to paragraph (15). . . .*

(15) Petition by handler for modification of order or exemption; court review of ruling of Secretary.

(A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

7 U.S.C. §§ 608c(14)(B), (15)(A) (emphasis added).

tionate. In making that determination, we note that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336, 118 S.Ct. 2028 (citing *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)).

In this case, Congress authorized the JO to assess a penalty against Balice for as much as $528,000. Balice nevertheless contends that it was constitutionally excessive for the JO to impose a $225,500 fine against the "least culpable member of the group" for a "first offense" that "occurred over 12 years ago" and that resulted in "no harm to the Government and no harm to the industry." That argument misrepresents the nature of Balice's conduct and the gravity of his offenses.

Balice was not, as he suggests, the "least culpable" member of the group. Indeed, he was in charge of the daily operation of the company and was in control of both the records and the stock of almonds. He willfully failed to maintain records for important transactions and later transferred whatever records that he did maintain to his uncles in Italy, despite the USDA's open ended request that he submit the records to auditors. That violation largely frustrated the USDA's attempts to ensure that Balice was complying with other provisions of the Almond Marketing Order, and it interfered with the Almond Board's ability to set its economic policy.

Even worse, Balice unlawfully disposed of reserve almonds, which were lawfully salable at only $0.05 to $0.08 per pound, when the prevailing market price for the almonds was $1.40 per pound. That conduct not only resulted in an illegal profit of roughly $246,677, but it also undermined the Secretary's efforts to protect the stability of the almond market. The severity of that conduct is highlighted by the Secretary's reasons for imposing an abnormally high reserve requirement for the 1987–1988 crop year. In prescribing the 18% reserve requirement, the Secretary explained:

While this rule may restrict the amount of almonds which handlers may sell in normal domestic and export markets, the salable and reserve percentages are needed to lessen the impact of the oversupply situation facing the industry and to promote stronger marketing conditions, thus avoiding unreasonable fluctuations in prices and supplies and improving grower returns. Further, this action will provide market stability during the 1988–89 crop year in the event that 1988 production is below market needs. Given the cyclical tendency of almond production, this is a likely possibility.

. . . .

[A]n oversupply of almonds could result in market instability and a downward spiral in prices, whereby buyers would be reluctant to purchase almonds until they were convinced that a bottom price had been reached. This could result in both decreased consumption and sharply lower prices. 52 Fed.Reg. 39,900, 39,-901–3 (1987).

Balice's failure to maintain an adequate reserve of almonds, therefore, was a serious violation of the reserve requirement. The fine of $224,500, which is less than Balice's potential profit from unlawfully handling his reserve, is not grossly disproportionate. *See Cole v. U.S. Dep't of Agric.,* 133 F.3d 803, 808–9 (11th Cir.1998) (holding that a $400,000 penalty, representing a forfeiture of 75% of the sale price of over-quota tobacco, was not excessive given the legislative purpose of discouraging the oversupply of tobacco in the marketplace).

AFFIRMED.