214 F.3d 1155 (9th Cir. 2000)
 SATYA VASUDEVA; SHAKUNTALA W. VASUDEVA, dba 7-Eleven; MICHAEL BELAY; SABA BELAY, dba 7-Eleven; THE SOUTHLAND CORPORATION, dba 7-Eleven, Plaintiffs-Appellants,
v.
UNITED STATES OF AMERICA, MICHAEL ESPY, Secretary of Agriculture; DANIEL R. GLICKMAN, Secretary of Agriculture, Defendants-Appellees.
 No. 98-35726
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted May 1, 2000--Seattle, Washington
Filed June 12, 2000
 [Copyrighted Material Omitted]
 Richard C. Tallman, David A. Zapolsky (argued), and Ann Marie Schwartz, Bogle & Gates, Seattle, Washington, for the plaintiffs-appellants.
 Christine Kohl (argued), Barbara C. Biddle, Carl E. Goldfarb, United States Department of Justice, Washington, D.C., for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-96-01252-TSZ
 Before: Edward Leavy, Pamela Ann Rymer, and Thomas G. Nelson, Circuit Judges.
 OPINION
 RYMER, Circuit Judge:
 
 
 1
 We must decide whether the regulation governing civil monetary penalties in lieu of permanent disqualification for trafficking in food stamps, 7 C.F.R. S 278.6(j), complies with the Administrative Procedure Act, comports with substantive due process, and was applied in this case against owners of three 7-11 stores in the Seattle area consistent with the Excessive Fines Clause of the Eighth Amendment.[1] The district court granted summary judgment in favor of the United States Department of Agriculture (USDA), and we affirm.
 
 
 2
 * Owners of three 7-11 stores participated in the Food Stamp Program pursuant to an agreement in which they agreed to accept responsibility on behalf of the firm to prevent violations of Food Stamp regulations, including trafficking regulations, and to accept responsibility for violations committed by the firm's employees. During March of 1996 investigators from the USDA visited the three stores as part of a compliance check on stores in the Seattle area. On the first visit to the Vasudeva store, the agent unsuccessfully tried to purchase ineligible items. On the second, third and fourth visits respectively, the agent sold $65, $120 and $100 in food stamps to the clerk for cash. On the first visit to the Belays' store, the clerk sold $60 in stamps for $30 in cash. No violations occurred on the second visit, but when the agent returned for the third visit, he purchased $4.56 of ineligible items. On the final visit, the clerk purchased $65 in stamps for $35. Agents visited the third 7-11 store, owned by the Southland Corporation, six times. On the second, third and fourth visits, a clerk sold the agent ineligible items. On the fifth and sixth visits, the same clerk bought food stamps from the investigator.
 
 
 3
 Trafficking in food stamps is illegal, 7 C.F.R.S 271.[2], and permanent disqualification is the default penalty for trafficking violations.2 However, store owners can opt to pay a civil monetary penalty (CMP) rather than be disqualified if the owner can show that the store had an effective anti-trafficking training program in place and that the store owner had no knowledge of the trafficking. 7 C.F.R. S 278.6(a), (i)(2).[3] The government agreed that all of the store owners in this case met both conditions and offered them the opportunity to pay a CMP. The method used to calculate the CMP is outlined in 7 C.F.R. S 278.6(j). For a first offender, the store's average monthly food stamp sales are multiplied by 10%, which is intended to approximate the store's monthly profit from food stamp sales. 55 Fed. Reg. 31809, 31810 (1990). If the trafficking violation is less than $100, the CMP is 60 times this monthly profit figure. The penalty is doubled if the violation is over $100. For second offenders, these figures are doubled -the penalties are 120 and 240 times the monthly food stamp profits.[4]
 
 
 4
 The Vasudevas averaged $441 a month in food stamp sales. Under the regulatory formula, their three offenses led to penalties of $2640, $5280, and $5280 for a total CMP of $13,200. The Belays had monthly food stamp sales averaging $3318 which led to a total CMP of $39,840. The Southland store averaged $1431 in food stamp business per month and was penalized $25,740 as well as being disqualified for six months for the non-trafficking offenses. All three stores were also required to pay a "fiscal claim" equal to the value of the stamps that their clerks had trafficked.
 
 
 5
 All three owners challenged the CMPs through the USDA administrative review process. The CMPs against the Vasudevas and the Belays were upheld, but the Review Officer reduced the CMP against Southland to $17,160. The Review Officer determined that the regulatory formula had been misapplied but did not explain the error. After the store owners filed this suit, the regional offices reduced the penalty against the Vasudevas to $5280 and against the Belays to $19,920. While no reason was given for these adjustments, the government's brief explains that the USDA interprets the regulation as only imposing a single penalty for all violations included in the same investigation.
 
 
 6
 The store owners appealed the administrative determination to the district court. On cross motions for summary judgment, the district court upheld the penalties. It ruled that the regulations establishing the CMP amounts are not arbitrary and capricious because the agency considered relevant factors and created a formula that imposes fines within the statutory caps. The court rejected the owners' claim that the Secretary had to exercise discretion on an individualized basis, and concluded that the regulation was consistent with Congressional intent to allow the Secretary to levy a lesser sanction against eligible stores. The court found no due process violation and that the owners' excessive fines claim failed because the trafficking fines are not so grossly excessive as to violate the Eighth Amendment. However, the district court struck the fiscal claims because the USDA could not produce evidence that the stamps were ever redeemed. The district court also lifted the six month disqualification imposed on Southland because the agency did not present evidence of carelessness as required by the regulations.[5] The store owners have timely appealed.
 
 II
 
 7
 The owners argue that the USDA's penalty scheme for imposing trafficking fines abuses agency discretion because it prohibits the use of discretion to tailor the fines to the facts of individual cases, contrary to Congress's mandate.[6] In their view, the use of average monthly food stamp redemptions to calculate the fines is also arbitrary and capricious because it treats innocent store owners in poor neighborhoods more harshly than equally innocent store owners in wealthier neighborhoods. And, because the fine methodology used by the agency was designed to punish store owners as harshly as disqualification, they maintain that it defies Congressional intent to create a more lenient penalty.
 
 
 8
 We disagree that adequate agency discretion was not exercised. The USDA in fact exercises discretion on a caseby-case basis in evaluating whether store owners are qualified for a CMP in lieu of permanent disqualification, and it exercised discretion in adopting the formula by which the amount of the CMP is determined. Congress authorized the Secretary to levy CMPs of up to $40,000 against eligible stores, 7 U.S.C. S 2021(b)(3)(B), and the Secretary's decision to do so through a formula that requires a store to forego profits generated from food stamps for an appropriate period of time is within the plain construct of the statute.
 
 
 9
 The store owners urge us to follow Ghattas v. United States, 40 F.3d 281 (8th Cir. 1994) and Corder v. United States, 107 F.3d 595 (8th Cir. 1997), but the reasoning in those cases does not indicate that the fines imposed in this case are arbitrary and capricious. In Ghattas , the court overturned the agency's refusal to allow Ghattas to apply for a CMP because he had missed the 10-day deadline, on the ground that by adopting an unreasonable time limit and thereby automatically making permanent disqualification the only available option, the agency had abdicated its responsibility to exercise the discretion Congress delegated. In Corder, based entirely on the formula, the agency imposed the maximum penalty authorized by statute, $40,000, on an unknowing first offender. The court concluded this was arbitrary as applied, and that the agency instead should be guided by "principles of fairness" delineated in other laws administered by the Department of Agriculture, such as the Packers and Stockyards Act.[7] As we recently explained, Corder turned on the effect, as reflected in that case, of subjecting nearly every first-time offender to a maximum $40,000 fine without any evaluation of preventive measures or complicity. See Balice v. United States Dep't of Agriculture, 203 F.3d 684, 691-92 (9th Cir. 2000) (so construing Corder in the context of interpreting the Packers and Stockyards Act). While the nature and number of the violations in these cases were factored into the store owners' eligibility for a CMP in lieu of permanent disqualification, they were not considered in connection with calculating the amount of the penalty. Nevertheless, we do not believe the CMPs here were arbitrary and capricious. Each was based on the store's own food stamps profits, and as applied, did not approach the statutory maximum.
 
 
 10
 The store owners' argument that the regulation is arbitrary and capricious because it penalizes stores based on the income of their clientele rather than the culpability of their owners fails as well. We considered a somewhat similar point made about permanent disqualification in Kim v. United States, 121 F.3d 1269 (9th Cir. 1997). Kim challenged his permanent disqualification in part on the footing that the agency failed to consider the hardship that would befall his customers who participate in the Food Stamp Program if they were unable to use their coupons at his market. We held that, at least with respect to trafficking violations,S 2021(b)(3)(B) provides for a CMP in lieu of permanent disqualification only if certain express requirements are met -and the existence of hardship to food stamp families is not among them, whereas hardship is the decisive factor in disqualification pursuant to S 2021(a) for non-trafficking offenses. In the case of trafficking, the regulatory formula is designed to recapture the profits retailers earn from their food stamp programs. First offenders are required to pay a CMP equal to their estimated profits for the next five years. 7 C.F.R. S 278.6(i). To the extent the formula imposes greater penalties on retailers serving poorer customers, it does so for a rational reason -they have greater food stamp profits. In this respect, the CMP is identical to disqualification since stores with a less affluent clientele are more likely to do more food stamp business, and thus have their profit structure depend more heavily on food stamp sales, than their counterparts who tend to serve more affluent customers. Furthermore, food stamp fraud at a store with a high volume of food stamp sales is more costly to the government than fraud at stores with low volume. In this way, the regulations provide greater incentives for high volume retailers adequately to police their employees and to stamp out trafficking. This is a rational purpose.
 
 
 11
 Nor can we fault the penalty scheme as contrary to Congressional intent. The 1988 amendments to the Food Stamp Act authorized civil monetary penalties for store owners in lieu of permanent disqualification in the belief that permanent disqualification was too severe a sanction when the store owners did not benefit from the trafficking and had taken compliance measures. See Kim, 121 F.3d at 1272. As we pointed out in Kim, Congress was also responding to court decisions striking down the USDA regulation providing for permanent disqualification of store owners even if they had no knowledge of the trafficking. See, e.g., R Ranch Market Corp. v. United States, 861 F.2d 236, 238 (9th Cir. 1988), overruling by statute recognized by Kim, 121 F.3d at 1273. The regulatory scheme does both these things, by imposing CMPs that are less burdensome for innocent owners than the previous regime of mandatory permanent disqualification regardless of innocence. We are not persuaded by the owners' contention that the CMP structure is just as harsh as permanent disqualification because it is designed to recapture the profits store owners earn from their food stamp sales. CMPs are but a temporary disqualification, and owners can opt for permanent disqualification if they believe a CMP is too high or is for undesirable for other reasons. 7 C.F.R.S 278.6(i). In sum, the USDA developed a penalty structure that is serious but less severe than permanent disqualification, and its decision to do so is not inconsistent with the intent of Congress.
 
 III
 
 12
 The store owners submit that CMPs violate substantive due process because they penalize owners who do not benefit from the trafficking. Kim forecloses this argument, as we concluded there that permanent disqualification of an innocent owner was consistent with due process. Kim, 121 F.3d at 1274. By definition, temporary disqualification is. Since the CMP is essentially equivalent to temporary disqualification and the owners retain the option of being permanently disqualified, the civil monetary penalty comports with due process.
 
 IV
 
 13
 That the CMPs in these cases do not run afoul of the Excessive Fines Clause also follows from Kim. An assessment is an "Excessive Fine" if it qualifies as a "fine " within the meaning of the Clause and is "excessive." United States v. Bajakajian, 524 U.S. 321, 334 (1998). Assuming that these CMPs are "fines," they are not excessive.
 
 
 14
 A fine is unconstitutionally excessive if it is "grossly disproportional to the gravity of the defendant's offense." Id. at 337. In Bajakajian, the Court considered the severity of the offense, the criminal fine that could have been imposed, and the harm caused by the defendant. In Balice, we further recognized that income earned from the illegal activity can be considered when deciding whether a fine is excessive. Balice, 203 F.3d at 699.
 
 
 15
 Here, the store owners claim that the CMPs are disproportionate to their culpability since they did not benefit from the trafficking and had an anti-trafficking policy in place, that the CMPs are disproportionate to the harm to the government because the retailers never redeemed the stamps in question, and that the CMPs are excessive because no criminal penalties could have been imposed for this trafficking since they did not know of the trafficking and did not benefit from it. But, as Congress has indicated, trafficking in food stamps is a serious offense that defrauds the federal government and undermines the viability of an important government program for the needy. Congress saw fit to authorize the Secretary to impose CMPs of up to $40,000 in lieu of permanent disqualification. In Kim, we held that permanent disqualification was not an excessive fine prohibited by the Eighth Amendment "because it is not cash or in kind payment directly imposed by, and payable to, the government." Kim, 121 F.3d at 1276. While CMPs are, of course, cash payments, they are the functional equivalent of (but a lesser exaction than) a permanent disqualification. As permanent disqualification can always be elected instead of the temporary disqualification to which a CMP amounts, the civil monetary penalty in lieu of permanent disqualification likewise does not run afoul of the Excessive Fines Clause.
 
 
 16
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The store owners are Satya V. and Shakuntala W. Vasudeva, Michael and Saba Belay, and the Southland Corporation, collectively referred to as "owners."
 
 
 [2]
 We extensively recounted the history of the 1988 amendments to the Food Stamp Act that permitted the USDA to impose a civil monetary penalty in lieu of permanent disqualification in Kim v. United States, 121 F.3d 1269, 1272 (9th Cir. 1997), and do not repeat it here.
 
 
 [3]
 7 C.F.R. S278.6(i) states:
 FNS may impose a civil monetary penalty in lieu of a permanent disqualification for trafficking as defined in S 271.2 if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective com pliance policy and program to prevent violations of the [Food Stamp] Program . . . . In determining the minimum standards of eligibility of a firm for a civil money penalty in lieu of a perma nent disqualification for trafficking, the firm shall, at a minimum, establish by substantial evidence its fulfillment of each of the fol lowing criteria:
 Criterion 1. The firm shall have developed an effective compliance policy as specified in S 278.6(i)(1); and
 Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and
 Criterion 3. The firm had developed and instituted an effective personnel training program as specified in S 278.6(i)(2); and
 Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the con duct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefitted from, or was involved in the conduct of any trafficking violations by the firm.
 
 
 [4]
 7 C.F.R. S 278.6(j) states:
 A civil money penalty assessed in accordance withS 278.6(i) shall not exceed $20,000 for each violation and shall not exceed $40,000 for all violations occurring during a single investigation. FNS shall determine the amount of the civil money penalty as follows:
 (1) Determine the firm's average monthly redemptions for the 12-month period ending with the month immediately preceding the month during which the firm was charged with violations;
 (2) Multiply the average monthly redemption figure by 10 per cent;
 (3) For the first trafficking offense by a firm, multiply the product obtained in S 278.6(j)(2) by 60 if the largest amount of food cou pons, ATP cards, or other benefit instruments involved in a single trafficking transaction had a face value of $99 or less. If the face value of coupons, ATP cards or other benefit instruments involved in the largest single trafficking transaction was $100 or more, the amount of the product obtained in this paragraph shall be doubled;
 (4) For a second trafficking offense by a firm, multiply the prod uct obtained in S 278.6(j)(2) by 120 if the largest amount of food coupons, ATP cards, or other benefit instruments involved in a single trafficking transaction had a face value of $99 or less and the same firm has once before been sanctioned for trafficking in food coupons, ATP cards, or other benefit instruments. If the face value of food coupons, ATP cards, or other benefit instruments involved in the largest single trafficking transaction was $100 or more, the amount of the product obtained in this paragraph shall be doubled; and
 (5) If a third trafficking offense is committed by the firm, the firm shall not be eligible for a civil money penalty in lieu of dis qualification.
 
 
 [5]
 The United States does not appeal the decisions on the fiscal claims and the disqualification.
 
 
 [6]
 Agency actions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706. A decision is arbitrary and capricious
 if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausi ble that it could not be ascribed to a difference in view or the product of agency expertise.
 Alvarado Community Hosp. v. Shalala, 155 F.3d 1115, 1122 (9th Cir. 1998), as amended 166 F.3d 950 (9th Cir. 1999).
 
 
 [7]
 The Packers and Stockyards Act provides: In determining the amount of the civil penalty to be assessed under this section, the Secretary shall consider the gravity of the offense, the size of the business involved, and the effect of the penalty on the person's ability to continue in business.
 7 U.S.C. S 213(b).