**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Peter MACKBY, Defendant–Appellant.**

No. 02–16778.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 2003.

Memorandum Filed June 3, 2003.

Memorandum Withdrawn Aug. 12, 2003.

Opinion Filed Aug. 12, 2003.

Patric Hooper, Hooper, Lundy & Bookman, Los Angeles, California, for the defendant-appellant.

Sara Winslow, Office of the United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: HAWKINS and W. FLETCHER, Circuit Judges, and KING,* Senior District Judge.

## ORDER

WILLIAM A. FLETCHER, Circuit Judge.

Appellee's request for publication, filed June 10, 2003, is GRANTED.

This court's Memorandum disposition, filed June 3, 2003, is hereby withdrawn and replaced with the following opinion.

Appellant's petition for panel rehearing and petition for rehearing en banc, filed July 7, 2003 are denied as moot.

## OPINION

In 1999, the United States won a civil judgment under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, against Peter Mackby, the owner and managing director of a physical therapy clinic, for submitting false Medicare claims. We affirmed Mackby's liability but remanded for a determination of whether $729,454.92 in civil penalties and treble damages violated the Excessive Fines Clause of the Eighth Amendment. *United States v. Mackby*, 261 F.3d 821 (9th Cir.2001) [hereinafter *Mackby I*]. On remand, the district court upheld the full judgment, concluding that it was not grossly disproportional to the gravity of Mackby's offense. *United States v. Mackby*, 221 F.Supp.2d 1106 (N.D.Cal.2002)[hereinafter *Mackby II*]. We now affirm.

## I. Background

Mackby, who is neither a physician nor a physical therapist, managed and owned the Asher Clinic, a physical therapy clinic in Larkspur, California. The clinic provided physical therapy services to Medicare patients under Medicare Part B. Medicare Part A, not at issue here, provides hospital insurance benefits to the elderly and disabled. 42 U.S.C. § 1395d; 42 C.F.R. § 406. Medicare Part B is a voluntary insurance program that pays a portion of the costs of some services not covered by Part A. 42 U.S.C. § 1395k; 42 C.F.R. § 410. Part B pays for physical therapy in two instances: (1) when rendered by a physician, a qualified employee of a physician, or a physician-directed clinic; or (2) when rendered by a qualified physical therapist in independent practice ("PTIP").[1] 42 C.F.R. § 410.60(a) (1996)

---

* The Honorable Samuel P. King, Senior District Judge for Hawaii, sitting by designation.

1. During the relevant time period, a physical therapist in independent practice was defined as one who engaged in the practice of physical therapy on a regular basis without the

administrative and professional control of an employer, maintained an office at his or her own expense, furnished services in that office or in the patient's home, and treated and collected compensation from his or her own

(superseded). During the relevant time period, Medicare capped the amount it would pay a PTIP on behalf of any one patient. *Id.* § 410.60(c)(2). No payment limit existed for physical therapy provided by or under the supervision of a physician.

Prior to 1988, Mackby had a partner, Michael Leary, a licensed physical therapist. During their partnership, the Asher Clinic billed Medicare Part B for physical therapy provided to Medicare patients by therapists at the clinic using Leary's Medicare personal identification number ("PIN"). During this period, the clinic was subject to the cap applicable to a PTIP. In June 1988, Mackby assumed sole control of the clinic and instructed the clinic's billing service to use the PIN of his father, Dr. Judson Mackby, in lieu of Leary's PIN for the clinic's Medicare Part B claims. Because the government was led to believe that Dr. Mackby was supervising physical therapy, it made payments to the clinic without regard to the cap. Dr. Mackby, however, did not provide or direct any medical services at the clinic and did not know his son was using his PIN. Mackby himself is a layperson and did not provide physical therapy or other medical services to patients.

In September 1996, Mackby obtained certification for the Asher Clinic as a rehabilitation agency eligible to make claims under Medicare Part A. From that point forward the clinic no longer billed Medicare Part B. Mackby sold the clinic in May 1997 for about $1.7 million.

In 1998, the United States brought a civil action against Mackby under the False Claims Act, 31 U.S.C. §§ 3729–3733, alleging that between 1992 and 1996 he caused 8499 false claims to be submitted to Medicare, resulting in payments totaling $331,078. The district court conducted a three-day bench trial and found that Mackby had violated the False Claims Act by knowingly submitting false Medicare claims using Dr. Mackby's PIN.

Although Mackby submitted 8499 claims totaling $331,078, the government sought damages only for those claims that exceeded Medicare's annual payment limit per beneficiary for PTIPs.[2] Between 1992 and 1996 the clinic submitted 1459 such claims totaling $58,151.64. Based on those claims, the district court awarded treble damages under the FCA, 31 U.S.C. § 3729(a), of $174,454.92. In addition to treble damages, the FCA also provides for a fine of not less than $5000 and not more than $10,000 per claim. *Id.* The government sought and the district court awarded the minimum statutory fine of $5000 per claim for 111 of the claims, representing one claim per beneficiary per year, for a total civil fine of $550,000. The total judgment against Mackby equaled $729,454.92.

We affirmed Mackby's liability, holding that Mackby had knowingly caused false Medicare claims to be submitted. *Mackby I,* 261 F.3d at 829. We further held that both the treble damages and the civil monetary penalty provided for in the FCA are, at least in part, punitive, and therefore subject to the Eighth Amendment Excessive Fines Clause. *Id.* at 830–31. We remanded to the district court to consider the constitutionality of the judgment against Mackby. *Id.* at 831.

Following the Supreme Court's decision in *United States v. Bajakajian,* 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the district court considered whether the judgment is "grossly disproportional

---

patients. 42 C.F.R. § 410.60(c)(1) (1996) (superseded); *Mackby I,* 261 F.3d at 824–25.

2. In 1992 and 1993 the limit was $750 per year. From 1994 through 1996 the limit was $900 per year. 42 C.F.R. § 410.60(c)(2) (1996) (superseded).

to the gravity of a defendant's offense." The court concluded (1) that Mackby was not involved in other illegal activities; (2) that taking into account all 8499 false Medicare claims totaling $331,078 caused by Mackby and the $10,000 maximum penalty per claim authorized by the FCA, Mackby faced a maximum civil penalty of nearly $85 million and a maximum treble damage award of nearly $1 million; and (3) that the government suffered significant harm as a result of Mackby's false claims. *Mackby II*, 221 F.Supp.2d at 1109–13. Weighing the gravity of the offense and the amount of the judgment, the court found the size of the judgment "necessary and appropriate for purposes of deterrence," *id.* at 1114, and held that it did not violate the Excessive Fines Clause, *id.* at 1107.

■ We review de novo whether a fine is unconstitutionally excessive. *Bajakajian*, 524 U.S. at 337, n. 10, 118 S.Ct. 2028.

## II. Discussion

■ In *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the Supreme Court established the standard for evaluating challenges under the Excessive Fines Clause: "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334, 118 S.Ct. 2028. Bajakajian had attempted to leave the country with $357,144 in legally obtained currency. He pled guilty to failing to report that he was transporting more than $10,000 outside the United States, as required by 31 U.S.C. § 5316(a)(1)(A). *Id.* at 325, 118 S.Ct. 2028. The district court imposed three years of probation and a $5000 fine, and concluded that the full $357,144 was subject to criminal forfeiture. The district court, however, found that full forfeiture would have been "extraordinarily harsh" and "grossly disproportionate" to the offense, and it ordered a forfeiture of $15,000 in addition to the fine and probation. *Id.* at 326, 118 S.Ct. 2028.

The government appealed, and the Supreme Court held that forfeiture of the full amount violated the Eighth Amendment's ban on excessive fines. The Court first held that the forfeiture was punitive and constituted a "fine" subject to the Eighth Amendment. *Id.* at 328, 118 S.Ct. 2028. The Court then considered the severity of Bajakajian's offense and its relation to other criminal activity, the maximum criminal penalty he faced, and the harm he caused. *Id.* at 337–39, 118 S.Ct. 2028. It used these considerations to weigh the gravity of the crime against the amount of the forfeiture and concluded that a $357,144 forfeiture was grossly disproportional to the gravity of the offense and therefore unconstitutional. *Id.* at 339–40, 118 S.Ct. 2028.

*Bajakajian* involved a criminal forfeiture, but the Court had previously concluded that civil forfeitures fall within the scope of the Eighth Amendment. *See Hudson v. United States*, 522 U.S. 93, 103, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In *Mackby I*, we held that both the treble damages and the civil penalty assessed against Mackby were, at least in part, punitive and therefore subject to the Excessive Fines Clause. *Mackby I*, 261 F.3d at 830–31.

*Bajakajian* does not mandate the consideration of any rigid set of factors in deciding whether a punitive fine is "grossly disproportional to the gravity of a defendant's offense." We have, nevertheless, looked to factors similar to those used by the Court in *Bajakajian* in our Excessive Fines Clause cases. In *United States v. 3814 NW Thurman Street*, 164 F.3d 1191, 1197–98 (9th Cir.1999), we held unconstitutional a civil forfeiture of $200,686.18 in connection with false statements made in a

loan application. We noted that there was an absence of other related illegal activity, that the fine was far out of proportion with the criminal penalties available under the Sentencing Guidelines for violating the underlying criminal statutes, and that the harm caused was minimal because neither the creditors nor the government suffered any actual loss. *Id.* at 1197–98. In *Balice v. United States Department of Agriculture*, 203 F.3d 684, 698–99 (9th Cir.2000), we upheld a $225,500 civil fine for violations of a federal Almond Marketing Order. Our Excessive Fines Clause inquiry focused on the maximum possible penalty authorized by Congress and the fact that the defendant made an illegal profit from his activity somewhat larger than the fine itself. In *Vasudeva v. United States*, 214 F.3d 1155, 1161–62 (9th Cir.2000), we upheld civil monetary penalties of $13,200 and $39,840 for trafficking in food stamps. We held that because trafficking in food stamps is a serious offense that defrauds the government and because the defendants could have elected permanent disqualification from the food stamp program instead of the monetary penalties, the fines were not excessive.

█ Today, we hold that the $729,454.92 judgment against Mackby does not violate the Excessive Fines Clause. The size of the penalty is not grossly disproportional to Mackby's level of culpability and the harm he caused. Mackby used a false Medicare PIN number to procure Medicare payments for which he was not eligible. As we explained in *Mackby I*, "[i]t is the representation of Dr. Mackby's involvement that is 'false.'" 261 F.3d at 827. Although the government did not seek damages for all of the claims, the district court found that Mackby submitted 8499 claims using Dr. Mackby's PIN. Since the use of the PIN led to liability, all 8499 claims constitute violations of the FCA. Furthermore, although the government sought damages only for the claims that

exceeded the PTIP cap, Mackby did not actually qualify as a PTIP after the departure of Leary in 1988 and thus was not eligible to receive any Medicare funds, let alone funds that exceeded the cap. *See Id.* at 829.

In *Bajakajian*, the Court found it significant that Bajakajian's crime was merely failing to report currency that was lawfully his and that he intended to use for a lawful purpose. 524 U.S. at 338, 118 S.Ct. 2028. The Court noted that Bajakajian did not fit into the class persons for whom the forfeiture statute was principally designed— money launderers, drug traffickers, and tax evaders. *Id.* The False Claims Act, however, targets those who knowingly make a false claim for payment to the government. *See* 31 U.S.C. 3729(a)(1); *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991) ("[W]hat constitutes the offense [under the False Claims Act] is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false.'"). Mackby, who submitted claims using a false PIN number, therefore falls among the class of persons targeted by the Act.

█ The penalties available under the FCA provide another guide to Mackby's level of culpability. *See Bajakajian*, 524 U.S. at 338, 118 S.Ct. 2028. The possible penalty available under the FCA is instructive but not dispositive of the constitutional question. *See id.* at 336, 118 S.Ct. 2028 (stating that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," but holding that grossly disproportional fines are nonetheless unconstitutional). The fact, however, that Congress provided for treble damages and an automatic civil monetary penalty per false claim shows that Congress believed that making a false claim to the government is

a serious offense. *See* S.Rep. No. 99–345, at 17 · (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5282 (noting, in raising the statutory penalty to $10,000 per claim, "that defrauding the Government is serious enough to warrant an automatic forfeiture"). We may properly consider the maximum penalty prescribed by Congress as part of our Excessive Fines Clause inquiry. *See Balice*, 203 F.3d at 699 (holding that a $225,500 penalty for illegal almond sales was not excessive in part because the maximum authorized penalty was $528,000); *United States v. Emerson*, 107 F.3d 77, 80–81 (1st Cir.1997) (holding that where a pilot made 37 unlawful charter flights without holding the proper FAA certificate a $5000 fine per flight was not excessive, and relying in part on the fact that the statutory maximum penalty was $10,000 per flight). Had the government sought damages for all 8499 claims, Mackby would have faced a maximum civil penalty of $84,990,000 ($10,000 per false claim). 31 U.S.C. § 3729(a). Furthermore, because the false claims resulted in payment of $331,078, the maximum treble damage award was $993,234. *Id.* The substantial difference between the actual judgment against Mackby—treble damages of $174,454.92 and a civil penalty of $555,000—and the maximum available penalties weighs against a finding of gross disproportionality.

Mackby urges us to compare the judgment against him to the fine he would have faced had he been criminally convicted under the False Claims Act, 18 U.S.C. § 287. After calculating the maximum penalty under the Sentencing Guidelines (assuming the amount of loss equals $58,151.64, which represents the claims exceeding the PTIP cap), Mackby argues that the Guideline fine range is only $7500 to $75,000, which even at the high end is an order of magnitude less than the civil judgment. Mackby's argument, however, does not take sufficiently into account the fact that his hypothetical criminal sentence could potentially include a term of imprisonment of 37–46 months, as well as restitution for the full amount of the loss.

Mackby focuses only on the disparity between the criminal fine available under the Guidelines and the judgment against him, but when courts have compared civil judgments with criminal penalties for the same conduct, they have considered the full criminal penalty. *See Bajakajian*, 524 U.S. at 338, 118 S.Ct. 2028; *Thurman Street*, 164 F.3d at 1197. In both *Bajakajian* and *Thurman Street*, the maximum penalty the defendant faced for the underlying offense under the Sentencing Guidelines was a $5000 fine and 6 months in prison. *Bajakajian*, 524 U.S. at 338, 118 S.Ct. 2028; *Thurman Street*, 164 F.3d at 1197. In neither case did the Guidelines require imprisonment. The Supreme Court held that the criminal penalty available under the Guidelines "confirmed a minimal level of culpability." *Bajakajian*, 524 U.S. at 339, 118 S.Ct. 2028. The substantially greater criminal penalties that Mackby hypothetically could have faced for his conduct do not "confirm a minimal level of culpability." *See id.*

■ Mackby's false claims also harmed the government, in the form of both monetary damages and harm to the administration and integrity of Medicare. The fact that Mackby's clinic actually performed the physical therapy for which he claimed reimbursement does not eliminate the government's injury. Damages under the FCA flow from the false statement. "Ordinarily the measure of the government's damages [under the FCA] would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir.1966). The falsity here was not Mackby's representation that

patients had received physical therapy, but the use of his father's PIN to obtain payments to which he was not entitled. Had Mackby been truthful, the government would have known that he was entitled to nothing because he was neither a doctor nor a physical therapist in private practice. In the legislative history to the FCA, Congress specifically rejected a "no harm, no foul" argument: "A false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act, ... and such claim[ ] may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program...." S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5275.

The government has a strong interest in preventing fraud, and the harm of such false claims extends beyond the money paid out of the treasury. *See U.S. ex rel. Rosales v. San Francisco Housing Auth.,* 173 F.Supp.2d 987, 1019–20 (N.D.Cal.2001) (discussing Congress's purpose in the FCA to maintain public confidence in the government by protecting against fraud). Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system. *See* S.Rep. No. 99–345, at 2–3, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267–68 (noting the pervasiveness of fraud in government in programs, including entitlement programs, and the difficulty in deterring fraud).

Finally, we view some part of the judgment against Mackby as remedial.[3] Before Congress amended the FCA in 1986, the Act provided for double damages and a $2000 maximum civil penalty per false claim. Discussing this provision in 1976, the Supreme Court concluded: " 'We think the chief purpose of the [Act's civil penal-

ties] was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole.' " *United States v. Bornstein,* 423 U.S. 303, 314, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (quoting *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). *See also Noriega–Perez v. United States,* 179 F.3d 1166, 1174 (9th Cir.1999) (holding that a $96,000 civil fine for counterfeit immigration documents was not excessive when the investigation cost approximately $48,000). The government admits it cannot quantify the expenses incurred in pursuing the claim against Mackby. But given the Supreme Court's conclusion that the earlier provision of the FCA for double damages plus a civil penalty was designed to be largely remedial, we can safely conclude that under the current statutory scheme at least some portion of the award that was over and above the amount of money actually paid out by the government was similarly remedial.

Considering both Mackby's culpability and the harm caused by his offense, we hold that the full $729,454.92 judgment against Mackby is not grossly disproportional to the gravity of his offense. The judgment of the district court is therefore **AFFIRMED.**

---

**3.** In *Mackby I,* we held that the both the civil penalty and the treble damage provision of the FCA were, at least in part, punitive. We do not decide here precisely what portion of either component of the judgment is remedial and what portion punitive.