**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

ROBERT I. BOURSEAU; RIB MEDICAL
MANAGEMENT SERVICES, INC., a
California corporation,
  *Defendants-Appellants,*

and

RUDRA SABARATNAM; NAVATKUDA,
INC., a California corporation,
  *Defendants.*

No. 06-56741

D.C. No.
CV-03-00907-RTB

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

ROBERT I. BOURSEAU; RIB MEDICAL
MANAGEMENT SERVICES, INC., a
California corporation,
  *Defendants,*

and

RUDRA SABARATNAM; NAVATKUDA,
INC., a California corporation,
  *Defendants-Appellants.*

No. 06-56743

D.C. No.
CV-03-00907-RTB

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

8645

Argued and Submitted
April 9, 2008—Pasadena, California

Filed July 14, 2008

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Beezer

**COUNSEL**

Patric Hooper, Los Angeles, California, for appellants Robert I. Bourseau and RIB Medicial Management Services, Inc.

Patric Hooper and Howard S. Levine, Los Angeles, California, for appellants Rudra Sabaratnam and Navatkuda, Inc.

Peter D. Keisler, Assistant Attorney General, Karen Hewitt, Acting United States Attorney, and Douglas Letter and Robert J. McAuliffe, Assistant United States Attorneys, Washington, D.C., for the appellee.

**OPINION**

BEEZER, Circuit Judge:

Robert I. Bourseau ("Bourseau"), RIB Medical Management Services, Inc. ("RIB"), Dr. Rudra Sabaratnam

("Sabaratnam") and Navatkuda, Inc. ("Navatkuda") (collectively, "Appellants"), appeal the district court's judgment holding them jointly and severally liable to the United States ("government") for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. We affirm.

## I

The parties agree that the underlying facts are not in dispute. The government brought this case on behalf of the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("Medicare") against two psychiatric hospital operators, Bourseau and Sabaratnam, and their single-employee corporations, RIB and Navatkuda, for fraud in the context of the Medicare reimbursement process.

### A.   The Medicare Reimbursement Process

Medicare reimburses hospitals, including psychiatric hospitals, for the reasonable costs of services that the hospitals provide to Medicare beneficiaries. 42 U.S.C. §§ 1395d(c), 1395k, 1395x(v)(1)(A); 42 C.F.R. § 410.27. Medicare reimburses such providers only for the portion of costs that relate to Medicare patients. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.50. Medicare contracts with private insurance companies, known as fiscal intermediaries, to facilitate the reimbursement process. 42 U.S.C. § 1395h; 42 C.F.R. § 413.64. Intermediaries pay providers an interim amount periodically throughout the year that is based on estimated treatment costs for Medicare patients. 42 U.S.C. § 1395g(e); 42 C.F.R. §§ 413.60, 413.64. At the end of the year, providers submit a final accounting of their actual costs for the year to their intermediaries in a document called a cost report. 42 C.F.R. § 413.20.

In order to reimburse providers for their Medicare expenses as quickly as possible, intermediaries make an initial retroac-

tive adjustment to the interim payments as soon as they receive the providers' cost reports. 42 C.F.R. § 413.64(f)(2); Provider Reimbursement Manual ("PRM"), Pt. 1 § 2408.2. In making the initial retroactive adjustment, intermediaries accept costs as they are reported on a cost report, except for obvious errors and inconsistencies. 42 C.F.R. § 413.64(f)(2); PRM, Pt. 1 § 2408.2. The cost reports are later subject to an audit. 42 C.F.R. § 413.64(f)(2); PRM, Pt. 1 § 2408.2. After intermediaries audit a cost report, intermediaries determine the providers' and Medicare's final liability to one another. 42 C.F.R. § 413.64(f)(2); PRM, Pt. 1 § 2408.2. In other words, an intermediary will use a cost report to determine whether a provider, or Medicare, is owed money based on the difference between the interim payments already paid to the provider and the actual amount that the intermediary determines was actually due to the provider. 42 C.F.R. §§ 405.1803, 413.9(b)(1), 413.60, 413.64(f). Recoupment of any overpayments made to a provider is made notwithstanding any request for a hearing to review an intermediary's determination. 42 C.F.R. § 405.1803(c).

If an intermediary has a valid basis for believing that proceedings have been or will be instituted in state or federal court to determine the solvency of a provider, the intermediary will adjust any interim payments "notwithstanding any other regulation or program instruction regarding the timing or manner of such adjustments, to a level necessary to insure that no overpayment to the provider is made." 42 C.F.R. § 413.64(i).

## B. Appellants' Cost Reports for 1997, 1998 and 1999

Between 1994 and 2000, Bayview Hospital and Mental Health Systems ("Bayview") was a psychiatric hospital that participated in the Medicare program. Bayview was owned and operated by a California limited partnership, known as California Psychiatric Management Services ("CPMS"). The only general partners in CPMS were RIB and Navatkuda.

Bourseau controlled RIB and served as its president and sole employee. Sabaratnam controlled Navatkuda and served as its president and sole full-time employee. Bourseau and Sabaratnam, through RIB and Navatkuda, ran CPMS and Bayview. Bourseau focused on operations management while Sabaratnam focused on medical management.

In 1996, CPMS filed for Chapter 11 bankruptcy. In 1998, the United States Bankruptcy Court for the Central District of California approved a reorganization plan for CPMS which, among other things, gave National Century Financial Enterprises, Inc. ("NCFE") a 49.9% limited partnership interested in CPMS. This made NCFE and CPMS "related parties" as that term is defined in the Medicare regulations.

Between 1997 and 1999, CPMS retained Paul Fayollat ("Fayollat") and Loretta Masi ("Masi") of Pacific Hospital Management to prepare and submit Bayview's 1997, 1998 and 1999 cost reports to its intermediary, Mutual of Omaha Insurance Company ("Mutual of Omaha").

In preparing the 1997 cost report, Bourseau and Sabaratnam met with Fayollat, Masi and CPMS' Director of Finance, Seth Morriss ("Morriss"). Fayollat advised Bourseau that Medicare would not reimburse Bayview for interest and bankruptcy legal fees unrelated to Bayview's Medicare patient services, and that it would be improper to include such amounts in the cost report. Notwithstanding Fayollat's advice, Bourseau directed Fayollat to include in the 1997 report (1) the total amount of interest charged by NCFE for earlier loans and (2) all of CPMS' bankruptcy legal fees. Only a portion of the interest and bankruptcy legal fees related to the operation of Bayview. CPMS never paid the interest to NCFE.

In preparing the 1998 cost report, Bourseau and Sabaratnam again met with Fayollat, Masi and Morriss. Fayollat advised Bourseau that Medicare would not reimburse Bayview for interest and bankruptcy legal fees unrelated to Bay-

view's Medicare patient services, and that it would be improper to include such amounts in the cost report. Notwithstanding Fayollat's advice, Bourseau directed Fayollat to include in the 1998 cost report (1) the total amount of interest charged by NCFE, (2) all of CPMS' bankruptcy legal fees, (3) a rental expense for a lease that never existed, (4) 16,965 additional square feet of space for a partial hospitalization program, although little of the additional space was actually used for Medicare patient care or operation support and (5) management fees for NCFE. Only a portion of the interest and bankruptcy legal fees related to the operation of Bayview. CPMS never paid the interest to NCFE.

In preparing the 1999 cost report, Bourseau again ignored Fayollat's advice and directed that Fayollat include in the 1999 cost report (1) all of CPMS' bankruptcy legal fees, (2) 16,965 additional square feet of space for the partial hospitalization program, although little of the additional space was actually used for patient care, (3) management fees for NCFE and (4) "program costs," representing additional interest payable to NCFE. CPMS never paid the interest to NCFE.

Mutual of Omaha never made adjustments to Bayview's cost reports, never audited the cost reports and never collected overpayments or paid underpayments. Between July of 1997 and October 2000, Bayview's Medicare reimbursement rates did not change. And in 2000, CPMS filed for bankruptcy again.

The government filed suit against Appellants in the United States District Court for the Southern District of California, alleging (1) violations of the FCA, (2) unjust enrichment and (3) common law fraud. After a six day bench trial, the district court held Appellants jointly and severally liable to the government for the FCA claims only. The district court found that Appellants' 1997, 1998 and 1999 cost reports constituted false claims under the FCA, actionable as both affirmative false claims and reverse false claims. The district court found

that by including false costs in its cost reports, Bayview had decreased the amount it owed Medicare by $5,219,195. The district court awarded the government $15,657,585 in treble damages and $31,000 in civil penalties.

Appellants timely and separately appealed. We consolidated their appeals.

## II

The district court had jurisdiction to enter its judgment despite CPMS' bankruptcy proceedings in 2000. *See* 11 U.S.C. § 362(b)(4); 28 U.S.C. § 1345; 31 U.S.C. § 3732(a); *Universal Life Church v. United States*, 128 F.3d 1294, 1298 (9th Cir. 1997). We have jurisdiction over this appeal under 28 U.S.C. § 1291.

We review de novo mixed questions of law and fact, *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004), and a district court's interpretation of the FCA, *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1143 (9th Cir. 1998). We review for clear error a district court's underlying factual findings, a standard which is "significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed' before reversal is warranted." *Matthews*, 362 F.3d at 1180 (internal quotation omitted).

## III

Appellants argue that their 1997, 1998 and 1999 cost reports do not violate the reverse false claims provision of the FCA.[1] We disagree.

---

[1]Appellants also argue that their cost reports are not actionable as affirmative false claims because the cost reports are not "claims" for payment. This argument has been squarely rejected. *See United States v. Neifert-White*, 390 U.S. 228, 233 (1968); *United States v. Jackson*, 845 F.2d 880,

**[1]** Title 31 U.S.C. § 3729(a)(7), the reverse false claims provision of the FCA, punishes anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." The government must prove five elements in order to establish liability under § 3729(a)(7). In this case, the government has met its burden.

## A.  False Record or Statement

Appellants do not contest that the cost reports are records or statements submitted to a government agent, but argue that none of the claimed costs is false.

The FCA does not define false. Rather, courts decide whether a claim is false or fraudulent by determining whether a defendant's representations are accurate in light of applicable law. *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999). Applicable law is subject to judicial interpretation.[2] *Id.* Courts have interpreted the FCA to cover claims for services not rendered, *see United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002), and Medicare cost reports containing nonallowed or inflated costs, *see*, *e.g.*,

---

882-83 & n.6 (9th Cir. 1988); S. Rep. No. 99-345, at 18-19 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5283-84. Nevertheless, we need not analyze Appellants' liability under the affirmative false claims provisions of the FCA because we hold that the government has established liability under the reverse false claims provision.

[2]Appellants argue that their statements were not false under a reasonable interpretation of the applicable regulations. Some courts hold that the government must prove that a claim is false under any reasonable interpretation of applicable law to succeed under the FCA. *See*, *e.g.*, *United States v. Alder*, 623 F.2d 1287, 1289 (8th Cir. 1980). We reject this approach. *See Parsons*, 195 F.3d at 463 (holding that the reasonableness of an interpretation may be relevant to the knowledge requirement but not the falsity requirement).

*United States v. Halper*, 490 U.S. 435, 437 (1989), *overruled on other grounds by Hudson v. United States*, 522 U.S. 93 (1997) (discussing damages resulting from inflated costs); *U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 451 (6th Cir. 2005) (unpaid costs); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 530 (10th Cir. 2000) (nonallowed costs).

Each of the claimed costs identified by the government is false as that term is used in the FCA context, for the reasons set forth below.

### 1. Interest

**[2]** The claims for interest were false for several reasons. First, the district court found, and Appellants do not dispute, that CPMS never paid any interest to NCFE. Under the Medicare regulations, interest must be paid within one year after it is included in a cost report unless "the provider furnishes to the intermediary sufficient written justification (based upon documented evidence) for nonpayment of the liability" and the intermediary grants an extension for good cause. 42 C.F.R. § 413.100(c). In this case, Mutual of Omaha knew that CPMS was in bankruptcy before March 1998 and after June 2000,[3] but CPMS never provided written justification based upon documented evidence for why it could not pay the interest to NCFE within one year, nor asked Mutual of Omaha for an extension for good cause. Nonpayment of the interest under these circumstances renders the claimed interest nonallowable and false.

**[3]** Second, the district court found that the 1997 and 1998 cost reports inflated the amount of interest related to Medicare patients. This finding is not clearly erroneous. Bourseau

---

[3]This knowledge would still not excuse including the interest on the 1999 and much of the 1998 reports, because CPMS was not in bankruptcy at those times.

admitted that much of the claimed interest did not relate to Medicare patient care at Bayview. Medicare only reimburses providers for expenses related to the care of Medicare beneficiaries. 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9. In the event that an intermediary deems a cost nonallowable but the provider disagrees, the provider may still include the cost in a cost report if "[t]he provider clearly indicates [the] item(s) is being included in the cost report only to establish the basis for an appeal and each disputed item and amount is specifically identified." PRM, Pt. 1 § 2905.2. "When [a provider files] a cost report under protest, the disputed item and amount for each issue must be specifically identified in footnotes to the settlement worksheet and the fact that the cost report is filed under protest must be disclosed." PRM, Pt. 2 § 115.1. "In addition, [a provider] must submit, with the cost report, copies of the working papers used to develop the estimated adjustments in order for the intermediary to evaluate the reasonableness of the methodology for purposes of establishing whether the cost report is acceptable." PRM, Pt. 2 § 115.2.

In a cover letter accompanying its 1997 cost report, CPMS put Mutual of Omaha on notice that it intended to include interest as a disputed item in the cost report, and that it would include supporting workpapers and documentation. The cost report contains an entry for the interest, but does not clearly indicate that the interest is a disputed item. Appellants do not provide supporting workpapers and there are no footnotes or other explanatory materials.

Similarly, in a cover letter accompanying its 1998 cost report, CPMS put Mutual of Omaha on notice that it intended to include interest as a disputed item in the cost report and that it would include supporting workpapers and documentation. The letter does not indicate where to find the item in the cost report, and there are no footnotes or other explanatory materials. The interest claimed in the 1997 and 1998 reports was inflated and did not comply with regulations governing disputed items, rendering the claimed interest false.

**[4]** Third, the district court found that CPMS and NCFE were related parties. This finding is not clearly erroneous because NCFE had a 49.9% limited partnership interest in CPMS. *See* 42 C.F.R. §§ 413.17(a), (b). Interest is not reimbursable if paid to a lender that is related to the provider through control or ownership, with limited exceptions that do not apply here. *See* 42 C.F.R. §§ 413.153(b)(3)(ii), (c). CPMS' inclusion of the nonallowable interest renders the claimed interest false.

**[5]** Finally, the district court found that the interest claimed in 1997, 1998 and 1999 cost reports was not supported by adequate documentation. This finding is not clearly erroneous because Appellants cannot cite any documentation to support the interest expenses. Medicare requires that providers include adequate cost data to support their claims for reimbursement. 42 C.F.R. §§ 413.20(a), (d), 413.24(a). CPMS' failure to adequately document the interest in these circumstances renders the claimed interest false.

## 2.  Bankruptcy Legal Fees

**[6]** The claims for bankruptcy legal fees were false. The district court found, and CPMS does not dispute, that the amount of bankruptcy legal fees claimed exceeded the amount of fees related to Bayview and/or Medicare patient care at Bayview. "Legal fees and related costs incurred by a provider are allowable if related to the provider's furnishing of patient care, e.g., legal fees incurred in appeals to the Provider Reimbursement Review Board. . . ." PRM, Pt. 1 § 2183. Appellants' inclusion of legal fees unrelated to patient care or Bayview renders the claimed bankruptcy legal fees false.

Bourseau's argument that the fees were properly included as disputed items fails because the cost report cover letters do not indicate where to find the fees in the cost reports and Appellants do not provide supporting workpapers, footnotes

or other explanatory materials. *See* 42 C.F.R. §§ 413.20(a), (d), 413.24(a); PRM, Pt. 2 § 115.2.

### 3.  Additional Space

**[7]** The claims for additional space were false. The additional space was used for staff meetings and storage, rather than patient care. Medicare allows reimbursement for areas used for staff meetings and storage, but it is allowable only in the "administrative and general" area of a cost report, not the "partial hospitalization program" area. Tr. 498:13-18; 793:4-794:23; 943:5-944:12. CPMS included the additional space in the wrong area of the cost report, which inflated the amount of CPMS' actual allowable costs. Under these circumstances, the claimed additional space was false.

### 4.  Management Fees

**[8]** The claims for management fees paid to NCFE were false. The district court found that NCFE provided no management services to CPMS. This finding is not clearly erroneous. The only evidence that NCFE provided management services was Bourseau's trial testimony that NCFE sent a representative to Bayview once per quarter to work with the accounting firm. At a pretrial deposition, Bourseau could not describe NCFE's management services in any detail, even though NCFE received payments of $20,000 per month for management services. Medicare reimburses management fees only to the extent they are incurred for the efficient delivery of needed health services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9(a). Under these circumstances, the claimed management fees were false.

### 5.  Rental Expense

**[9]** Finally, the claimed rental expense was false. Appellants admit that the rental expense never existed.

### B.  Knowledge of Falsity

Bourseau argues that he did not knowingly include false statements in the cost reports because he relied on good faith interpretations of the Medicare regulations in submitting the cost reports. Sabaratnam argues that he did not knowingly include false statements in the cost reports because financial operations were not his responsibility.

**[10]** The FCA defines "knowing" and "knowingly" to mean that, with respect to information, a person: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). "[N]o proof of specific intent to defraud is required." *Id.* " 'The requisite intent is the knowing presentation of what is known to be false,' as opposed to innocent mistake or mere negligence. 'Bad math is no fraud,' proof of mistakes 'is not evidence that one is a cheat,' and 'the common failings of engineers and other scientists are not culpable under the Act.' " *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (quoting *U.S. ex rel. Anderson v. N. Telecomm., Inc.*, 52 F.3d 810, 815 (9th Cir. 1995)).

### 1.  Bourseau and RIB

Bourseau acted with knowledge that each disputed item in the cost report was false.

**[11]** Bourseau acted with actual knowledge that the claimed interest was false. He admitted that it had never been paid, yet did not provide written justification or request an excuse for nonpayment, *see* 42 C.F.R. § 413.100(c), did not disclose it as a disputed item with any detail near that required, *see* PRM, Pt. 1 § 2905.2; PRM, Pt. 2 § 115, and did not retain adequate supporting documentation, *see* 42 C.F.R. §§ 413.20(a), (d), 413.24(a).

**[12]** Bourseau acted with at least reckless disregard of the truth or falsity of the claimed bankruptcy legal fees. He admitted that much of the bankruptcy legal fees did not relate to Medicare patient care, even though it is clear that reimbursable fees must relate to patient care. PRM, Pt. § 2183. He also failed to disclose the fees as a disputed item with any detail near that required. PRM, Pt. 1 § 2905.2; PRM, Pt. 2 § 115.

**[13]** Bourseau acted with at least reckless disregard of the truth or falsity of the additional space. Medicare allows reimbursement for meeting and storage space,[4] but CPMS included it in the wrong area of the report, resulting in a higher reimbursement to CPMS.

Bourseau acted with actual knowledge that the management fees were false. The district court properly found that NCFE never rendered management fees, which Bousreau would have known based upon his position within CPMS.

**[14]** Finally, Bourseau acted with at least reckless disregard of the truth or falsity of the rental expense. Bourseau admitted that the rental expense never existed, but claims that its inclusion in the cost report was a mistake. Affirmatively including a non-existent rental expense of $396,209 on a cost report to seek reimbursement from the government is at least reckless disregard of the truth or falsity of the rental expense, if not actual knowledge of the falsity of the rental expense.

**[15]** Considering the regulations described above and the degree to which Bourseau's actions deviated from them, Bourseau did not rely on good faith interpretations of the regulations in including the disputed costs in the cost reports. *Cf. Parsons*, 195 F.3d at 463 (recognizing that a good faith but mistaken interpretation of applicable regulations may negate the knowledge requirement).

---

[4]There is evidence to suggest that this space had actually been closed for years. Tr. 613:2-13.

### 2. Sabaratnam and Navatkuda

**[16]** The district court found that Sabaratnam agreed with Bourseau's decision to submit the cost reports. This finding is not clearly erroneous. Although Sabaratnam did not prepare or sign the cost reports, he was generally familiar with cost reports, having signed one in the past, and he had attended two meetings held for the purpose of discussing the cost reports at issue. In addition, when asked whether Sabaratnam agreed with Bourseau's 1998 cost reporting decisions, Bourseau responded, "I would say so, but it just wasn't his area of responsibility, it was mine." Tr. 1000:14-21. Sabaratnam acted with at least reckless disregard to the truth or falsity of each claim when he agreed to submit the cost reports.

**[17]** Notwithstanding his agreement with Bourseau, Sabaratnam also acted in deliberate ignorance of the truth of the cost reports. In defining knowingly, Congress attempted "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Congress adopted "the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id.* at 20; *see also id.* at 7 (discussing the importance of individual responsibility because the government has limited resources to police fraud). "While the Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and prudent under the circumstances.' " *Id.* at 21.

**[18]** Sabaratnam, as president of Navatkuda and a general partner of CPMS, depended upon the cost reports for reimbursement just as much as Bourseau and RIB. He undertook no inquiry into the cost reports, let alone a reasonable and

prudent one. His behavior falls within the category of deliberate ignorance.

**[19]** Sabaratnam and Navatkuda, along with Bourseau and RIB, acted with the scienter required under the FCA.

### C. Makes, Uses or Causes to be Made or Used a False Statement

Sabaratnam argues that he did not make, use or cause to be made or used the cost reports at issue.[5]

**[20]** Sabaratnam frames his argument solely in terms of "presentment," arguing that he did not "present or cause to be presented" false claims to the intermediary. Presentment is an element in a cause of action under § 3729(a)(1), which punishes someone who "knowingly *presents, or causes to be presented*, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis added). Presentment is not an element in a cause of action under § 3729(a)(7), which is the cause of action at issue here. *Cf. Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, No. 07-214, slip op. at 6 (U.S. June 9, 2008) (holding that there is no presentment requirement in § 3729(a)(2), which uses the same "makes, uses, or causes to be made or used" language found in § 3729(a)(7)).

**[21]** Unlike § 3729(a)(1), § 3729(a)(7) focuses on a defendant who "knowingly *makes, uses, or causes to be made or used*, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (emphasis added). The plain language of this statute requires that a defendant make or use a false record or statement in order to conceal, avoid

---

[5]Bourseau does not dispute that he made, used and signed the cost reports at issue.

or decrease an obligation to pay the government. *Cf. Allison Engine Co., Inc.*, No. 07-214, slip op. at 5 (holding that § 3729(a)(2) requires the government to prove that the defendant made a false statement to get a false claim paid or approved). Sabaratnam, in his capacity as president of Navatkuda and general partner of CPMS, used and agreed to use the false cost reports in order to decrease CPMS/Bayview's obligation to pay money to Medicare.

### D. Purpose to Conceal, Avoid or Decrease an Obligation to Pay Money to the Government

Appellants argue that they had no specific, independent, preexisting obligation to pay Medicare. Appellants argue that their interim payment rates were based upon the cost report from 1996, such that any repayment obligation arose because of the 1996 cost report. Appellants further argue that they had no duty to pay a "specific and definite sum" because the cost reports were never audited.

**[22]** The FCA does not define "obligation," and we have not set forth a framework for determining whether an obligation exists under the FCA. The Sixth and Eighth Circuits use the following analysis in determining whether an obligation exists:

> To recover under the False Claims Act, . . . the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of

> debt at common law for money or things owed. . . .
> The deliberate use of the certain, indicative, past
> tense suggests that Congress intended the reverse
> false claims provision to apply only to existing legal
> duties to pay or deliver property.

*Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 735 (6th Cir. 1999) (quoting *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997)).

This definition is consistent with the language and intent of the FCA, *see* S. Rep. No. 99-345, at 9 ("A false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act . . . ."), as well as holdings of the Fifth, Tenth and Eleventh Circuits. *See U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195-96 (10th Cir. 2006), *cert. denied*, 128 S. Ct. 388 (2007) (holding that an obligation must be existing and arise from an independent legal duty); *U.S. ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) (defining what an obligation is not); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (recognizing an obligation exists pursuant to contract). We adopt it.

**[23]** Under this framework, Appellants had a legal obligation to pay the government money at the time they submitted the cost reports. Between 1994 and 2000, CPMS was a Medicare provider, subject to a Medicare Provider Agreement requiring compliance with all Medicare regulations. *See* 42 U.S.C. § 1395cc; 42 C.F.R. §§ 411.406, 413.24(f), 489.11. Medicare regulations allowed CPMS to receive interim payments throughout the year from the Medicare Trust Fund, but required that CPMS repay any overpayments at the end of each reporting period. 42 C.F.R. § 413.20(d)(1); *see also* 42 U.S.C. § 1395g(a); 42 C.F.R. §§ 413.60, 413.64, 405.377, 405.378, 405.1803. Medicare was also required to pay CPMS any underpayments at the end of each reporting period. 42

C.F.R. § 413.20(d)(1); *see also* 42 U.S.C. § 1395g(a); 42 C.F.R. §§ 413.60, 413.64, 405.377, 405.378, 405.1803.

Because cost reports are not final until after an audit, the specific amount of the repayment obligation, for either CPMS or Medicare, may not have been known at the time the report was filed, *see*, *e.g.*, 42 C.F.R. § 413.64(f), but both sides were under a continuing, specific obligation to repay each other. *See* S. Rep. No. 99-345, at 18-19 ("A false claim for reimbursement under [ ] Medicare . . . is actionable under the act."). Similarly, CPMS' bankruptcy may have frozen both the rate for interim payments and Medicare's ability to collect overpayments, but it did not eliminate CPMS' obligation to reimburse Medicare for overpayments. This obligation was not potential, like fines and penalties which have not been levied or assessed, but rather existing and specific because CPMS had been accepting Medicare funds. *See Ga. Gulf Co.*, 386 F.3d at 657-58.

**[24]** By including nonexistent, nonallowed and inflated costs in their cost reports, Appellants concealed and decreased amounts that they were obligated to repay to Medicare. This obligation was fixed, even if the specific amount of the repayment obligation was not.

## E.   Materiality

Appellants argue that their cost report entries were not material because they had no impact on any payment decision made by the intermediary.

**[25]** The text of the FCA does not include a materiality requirement, but legislative history indicates that § 3729(a)(7) was enacted to provide that "an individual who makes a *material misrepresentation* to avoid paying money owed the Government should be equally liable under the Act as if he had submitted a false claim" S. Rep. No. 99-345, at 15 (emphasis added). We have incorporated a materiality element into the

FCA, at least within the context of false certification and promissory fraud cases. *See U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 2099 (2007). Recently, the Sixth Circuit analyzed this issue and, using the framework set forth in *United States v. Wells*, 519 U.S. 482, 490-92 (1997), concluded that the FCA includes a materiality element. *Medshares Mgmt. Group, Inc.*, 400 F.3d at 440-44. We find the reasoning of the Sixth Circuit persuasive, and hold that the FCA includes a materiality requirement. This holding is consistent with the law in the First, Fourth, Fifth, Sixth and Eighth Circuits. *Medshares Mgmt. Group*, 400 F.3d at 442; *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 679 (5th Cir. 2003); *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 886-87 (8th Cir. 2003); *U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir. 1997); *United States. v. Data Translation, Inc.*, 984 F.2d 1256, 1267 (1st Cir. 1992). *But see U.S. ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 415 (3d Cir. 1999) (casting doubt on whether materiality is an element under the FCA, but declining to resolve the issue).

**[26]** The Supreme Court has stated that "[i]n general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.' " *Neder v. United States*, 527 U.S. 1, 16 (1999). Yet, circuit courts are split on how to measure materiality in the context of the FCA. *See Medshares Mgmt. Group, Inc.*, 400 F.3d at 445. The Fourth and Sixth Circuits have adopted a "natural tendency test" for materiality, which focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered. *Id.* The Eighth Circuit has adopted a more restrictive "outcome materiality test," which requires a showing that the defendant's actions (1) had "the purpose and effect of causing the United States to pay out money it is not obligated to pay," or (2) "intentionally deprive[d] the United States of money it is lawfully due." *Id.* (citing *Costner v. URS Consultants*, 153 F.3d 667, 677

(8th Cir. 1998)). We agree with the Fourth and Sixth Circuits that the natural tendency test is the appropriate measure for materiality because it is more consistent with the plain meaning of the FCA. *Id.* Applying the natural tendency test to this case, we hold that Appellants' cost report entries were material because they had the potential effect, or natural tendency, to decrease the amount CPMS owed Medicare in overpayments, despite the fact that cost reports were never audited.

**[27]** Appellants' submission of the 1997, 1998 and 1999 cost reports satisfy all five elements necessary to establish liability under § 3729(a)(7).

## IV

Appellants argue that the district court erred in awarding treble damages in this case. We disagree.

### A.   The Government Sustained Damages

Appellants argue that even if they are liable under § 3729(a)(7), the government did not sustain damages in this case because the government never relied upon the cost reports to pay CPMS.

Because of CPMS' 1996 bankruptcy, it is accurate to state that Medicare did not increase its rates beyond those set in the 1996 cost report. But Medicare was never prohibited from decreasing its rates, thereby minimizing any potential overpayments. If an intermediary has a valid basis for believing that proceedings have been or will be instituted in state or federal court to determine the solvency of a provider, the intermediary will adjust any interim payments "notwithstanding any other regulation or program instruction regarding the *timing* or *manner* of such adjustments, *to a level necessary to insure that no overpayment to the provider is made.*" 42 C.F.R. § 413.64(i) (emphasis added). Although the Provider Reimbursement Manual may indicate that intermediaries will

not make adjustments once they learn that a provider is potentially insolvent, by its very terms, section 413.64(i) applies regardless of the Provider Reimbursement Manual with respect to this issue. *Compare* 42 C.F.R. § 413.64(i), *with* PRM, Pt. 1 § 2408.2 (stating that intermediaries should not make a tentative or initial retroactive adjustment to interim payments when they know that a provider is insolvent, but rather that intermediaries should make necessary adjustments when the cost report is "settled."). Similarly, although the regulations provide that intermediaries generally do not determine final liability until after an audit is made, *see* 42 C.F.R. § 413.64(f)(2); PRM, Pt. 1 § 2408.2, section 413.64(i) clearly indicates that this general rule is preempted once an intermediary learns that a provider is potentially insolvent.

[28] Appellants' inclusion of nonallowable, inflated and fictitious costs in the 1997, 1998 and 1999 cost reports impeded the intermediary's ability to determine whether maintaining the 1996 rates would result in overpayments, and therefore impeded the intermediary's ability to determine whether it should have decreased interim payments. This damaged the Medicare Trust Fund by causing Medicare to continue making interim payments at the 1996 rates instead of lower rates.

The Sixth Circuit considered and rejected an argument similar to that made by Appellants. In *Medshares Management Group, Inc.*, the Sixth Circuit held that the government's failure to issue a notice of provider reimbursement ("NPR") does not preclude the government from establishing that it has sustained actual damages. 400 F.3d at 455. Instead, an NPR, which is a written document issued by the intermediary to the provider reflecting the amount of reimbursement due to the provider, is merely an administrative mechanism used to make adjustments for overpayments or underpayments. *Id.* at 456. Whether and when the intermediary issues an NPR does not change whether the government sustained damages to the

treasury and to the integrity of the Medicare program as a result of fraud. *See id.* at 456-57.

CPMS owes Medicare money as a result of overpayments that Medicare made to CPMS based on the 1997, 1998 and 1999 cost reports. It now appears as though Medicare will not recover the full amount that it has already made in overpayments because CPMS has filed for bankruptcy again. Nonetheless, Medicare should be allowed to attempt to recover its losses in CPMS' bankruptcy. To hold otherwise would allow CPMS to escape repaying what it has already received in overpayments.

Damages for a reverse false claim consist of the difference between what the defendant should have paid the government and what the defendant actually paid the government. 1 John T. Boese, Civil False Claims and Qui Tam Actions 3-5 (3d ed. Supp. 2008). Once a defendant is found liable under any provision of § 3729(a), that defendant "is liable to the United States Government for . . . 3 times the amount of damages which the Government sustains because of the act." 31 U.S.C. § 3729(a). If the defendant cooperates with the government, then the defendant is liable to the government for "not less than 2 times the amount of damages which the Government sustains because of the act." *Id.*

**[29]** In this case, the government's expert, Charles Potter ("Potter"), used a program to determine that Medicare overpaid CPMS by $5,219,195 between 1997 and 1999 because of the false claimed costs. CPMS never reimbursed the government, so if Potter's calculation is correct, the difference between what CPMS should have repaid the government and what it did repay the government is $5,219,195. There is no evidence that Appellants cooperated with the government, so the district court properly awarded treble damages under the statute in the amount of $15,657,585.

### B.    The District Court's Calculation of Damages Was Supported by the Evidence

Appellants argue that even if they are liable and the government has sustained damages, the district court's calculation of damages, based upon Potter's "what if" program, was incorrect because the intermediary never made any adjustments to the cost reports.

As discussed above, none of the disputed costs was allowable, so the intermediary would have disallowed all of the disputed costs in determining CPMS' repayment obligation. Potter's "what if" program simulated this process because he removed all disputed costs from the cost reports, which resulted in a figure of $5,219,195 representing overpayments made to CPMS. Even if CPMS believed that some of the costs should have been allowed, CPMS would still have had to repay Medicare $5,219,195 at the time it filed the cost reports, because challenges to an intermediary's determination of liability do not postpone a provider's obligation to repay the government the amount an intermediary initially determines to be due. *See* 42 C.F.R. § 405.1803(c). Thus, Potter's calculation and the district court's ultimate damages award was supported by the admissible evidence.

### C.    The Treble Damages Award Does Not Violate the Constitution

Finally, Appellants argue that even if they are liable, the government sustained damages and the district court's calculation of damages was correct, an award of treble damages in this case is unconstitutional.

An award of treble damages and civil penalties under the FCA is, at least in part, punitive and subject to the Eighth Amendment's Excessive Fines Clause. *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003). An award of treble damages under the FCA violates the Excessive Fines

Clause if it is grossly disproportional to the gravity of a defendant's offense. *Id.* There is no rigid set of factors in deciding whether an award is grossly disproportional to the gravity of a defendant's offense, but we consider the following factors relevant: (1) the severity of the offense and its relation to other criminal activity; (2) the maximum penalty faced; (3) the harm caused and (4) whether the defendant falls within the class of persons targeted by the applicable law. *Id.* at 1016-17.

In this case, the second factor favors Appellants because the district court imposed treble damages and the maximum amount of allowable civil penalties. Yet we have found no law requiring a district court to award less than treble damages and the maximum amount of allowable civil penalties in an FCA case in order to satisfy the Excessive Fines Clause. The FCA, itself, instructs the district court to treble damages and provides the district court with limited discretion in calculating civil penalties. *See* 31 U.S.C. § 3729(a).

"Congress provided for treble damages and an automatic civil monetary penalty per false claim," which "shows that Congress believed that making a false claim to the government is a serious offense." *Mackby*, 339 F.3d at 1017. The government sustained harm to its treasury and to the integrity of the Medicare program itself. *Medshares Mgmt. Group, Inc.*, 400 F.3d at 456. And Appellants fall squarely among the class of people targeted by the FCA. *See Mackby*, 339 F.3d at 1017. Considering these factors, we cannot conclude that the district court's judgment is grossly disproportional to the gravity of Appellants' offenses.

## V

**[30]** Appellants are liable under the reverse false claims provision of the FCA for the submission of false statements in their 1997, 1998 and 1999 cost reports. The government sustained actual damages and is entitled to a treble damages

award of $15,657,585 and a civil penalties award of $31,000.

**AFFIRMED.**